### ALLEN v. ROYDHOUSE.

(District Court, E. D. Pennsylvania.   June 5, 1916.)

No. 2962.

1. CORPORATIONS ⬡319(8)—ACTION TO ENFORCE LIABILITY OF DIRECTOR—QUESTION FOR JURY.

The question of the negligence of a director of a corporation in the performance of his duties *held*, on the evidence, one for the jury.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1415; Dec. Dig. ⬡319(8).]

2. TRIAL ⬡214—INSTRUCTIONS—DUTY TO STATE LAW.

The standard of duty of a director of a corporation is one prescribed by law, and in an action by a receiver against a director to recover for losses due to mismanagement, it is the duty of the court to instruct the jury as to such standard.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 480; Dec. Dig. ⬡214.]

3. CORPORATIONS ⬡310(2)—LIABILITY OF DIRECTOR FOR MISMANAGEMENT—STANDARD OF DUTY.

The standard of duty by which the acts or omissions of a director of a corporation is to be measured is that set by the ordinary director, and not that of the ordinary man.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1353–1357, 1359–1361; Dec. Dig. ⬡310(2).]

4. TRIAL ⬡295(1)—INSTRUCTIONS.

A charge to a jury is to be considered as a whole, and not tested by the standard of absolute verbal accuracy in every isolated phrase.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 713, 714, 1717; Dec. Dig. ⬡295(1).]

5. CORPORATIONS ⬡319(8)—ACTION TO ENFORCE LIABILITY OF DIRECTOR—INSTRUCTIONS.

Instructions in an action by the receiver of a corporation against a director to recover for losses alleged to have resulted from negligent management considered, and *held* without error.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1415; Dec. Dig. ⬡319(8).]

At Law.   Action by William F. Allen, receiver, against George W. Roydhouse.   Sur motion by plaintiff for a new trial.   Motion denied.

G. P. Middleton and John Blakeley, both of Philadelphia, Pa., and Henry F. Parmelee, of New York City, for plaintiff.

Charles S. Wesley and A. M. Beitler, both of Philadelphia, Pa., for defendant.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DICKINSON, District Judge. The trial of this case was conducted with conspicuous ability and in a justice-seeking spirit, and with a display of fairness and frankness which is refreshing. The defense was presented with a like ability and in a like spirit. The trial, so far as within the control of counsel, could not have been more satisfactory or conducted with greater ability. This removes from the case as now presented all except the appellate questions which arise out of the trial, and disposes of all features which call for an exercise of the power of the court to interfere with the verdict. Even stripped of everything except the features which present the complaints of trial errors, a recital of the facts of the case as submitted to the jury must necessarily be lengthy.

The Seaboard Portland Cement Company, whose business purpose is indicated by its name, was brought into existence in a familiar way. The company was organized and its capital stock fixed at $5,000,000. A $2,000,000 bond issue was then authorized. At the same time it was arranged that the real promoters of the enterprise raise the required cash capital to build a plant and carry out the work of erecting it. The general scheme was that when the plan was carried out the company would have a complete working plant of a certain per diem producing capacity, whose efficiency had been proven by a six-months test, under operating conditions, and be supplied with a cash working capital of $100,000. For this fully equipped plant the promoters were to receive the $2,000,000 bond and the $5,000,000 stock issue. It may be stated, in passing, as an admitted fact, that the expected success of the general business purpose embraced in the plan had a justified basis in general business conditions and the favorable opportunities which the plan created. The plan was open to criticism only in the two respects of a possible improvidence in what was to be given for the plant and the possible absence of a safe assurance that the company would receive the consideration for the issue of its securities. The necessity to provide the cash to build the plant was planned to be met by organizing the promoters into a company to sell the bonds. Approximately $1,500,000 in money was required. The sale of bonds was sought to be promoted by giving the stock as a bonus to bond purchasers.

Another feature of the plan was the constructive work of building the plant. To secure this the promoters organized themselves into another company, which undertook this work. Had the constructing company been financially responsible, or had the financing company been able to supply the needed money, so that the constructing work could be done, it is obvious that the labors and duty of the directorate of the Cement Company, which came into office after these preliminary contracts had been made, would have been limited to seeing to it that the company received in plant and equipment that to which it was entitled. The absence of responsibility in both the constructing and the financing companies put upon such directorate the further duty of supervising the sale of the bonds and the construction of the plant, so as to assure the proper application of the proceeds of the sale of its securities, in order that the Cement Company should receive value for

the securities issued. The Cement Company was incorporated, and the attempt to carry out this general plan had been continued to about April or May, 1912, before this defendant was brought into the management. Changes had been made in the plan until at that time it had reached the actual condition of its being realized that the Cement Company must do both the financing and the constructive work of the project. That each might be well done the services of the defendant were sought, because of his large experience and admitted skill and judgment in constructive work, and the services of others of like experience, training, and knowledge of financial methods were also secured. The advantages of the application of the principle of the division of labor were sought by assigning to the defendant the special duty of looking after the constructive work and committing to others the charge and control of all financial matters. Indeed, the defendant consented to serve on condition that he was to be relieved of all concern with the financing part of the problem. It may be further stated, in passing, to be an admitted fact that the defendant did the special work assigned him faithfully and well. The evils of which plaintiff complains developed wholly in the financing department.

It is well to pause here to get a view of conditions as we now know them to have existed when the defendant became a director. These are stated with the reservation of the difference between conditions now known and conditions of which the defendant knew or should have known. We now know that the financing of the promoters prior to May, 1912, was done in a way which can only be explained as consistent with good faith on the theory that the dominating personality among the promoters looked upon the securities of the Cement Company as his property, subject only to the obligation on his part to complete the plant, in his ability to do which he had unquestioning confidence. Whatever the motives which actuated him, he used the Cement securities to carry mining operations in which he was interested, and exchanged Cement bonds for what proved to be worthless stocks in other enterprises, and made over-liberal advances to himself and to agents who were selling the Cement securities. The net result was that $600,000 in bonds and a corresponding share of the stock issue had been parted with, for which the company had nothing to show except $150,000 or $160,00 expended in constructive work of doubtful value, and what is known as the Scott note for $25,000, and certificates for $50,000 of the stock of the Glazier Stove Company, both of which were valueless. This situation had evoked criticism which centered upon one of the promoters.

The plaintiff, of course, concedes the nonresponsibility of the defendant for losses which befell the company before he became a director. The cause of action in the instant case is based upon the averments of loss to the company flowing from like transactions occurring after the defendant became a director, and which he could and should have prevented, resulting in the dissipation of all of the securities of the company, none, or very little, of which were applied to the work of construction, or in any way to the use of the company. Knowledge on the part of the later directors of what had before been done is

claimed to have an important bearing upon the necessity for the exercise of watchfulness on their part over the future acts of those who had shown themselves not to be trusted.

This outline statement of the fact situation will present with substantial clearness the appellate features of the case as now presented. The limits of an opinion will not permit room for a discussion of all the points of complaint. They will therefore be grouped in classes.

[1] 1. Complaint is made of the verdict. If this defendant is to be judged by the results of the management of which he was part, the verdict is wrong. If, however, the test of his responsibility is not the results of this management (for which the very able counsel for plaintiff does not contend), but is to be found in a fair judgment of his conduct as a director, based upon a compared view of what he did with what, as a director, he should, under all the circumstances, have done, the verdict was not baseless. The verdict is one to which may be applied a quotation from the opinion of Mr. Justice Holmes in Louisville v. Stewart, 241 U. S. 261, 36 Sup. Ct. 586, 60 L. Ed. ——:

"Whatever might have been our opinion, had we been in the jury's place, we do not feel warranted in saying that they had no evidence to go upon."

The verdict is accepted as one well within the proper province of the jury to have rendered. Unless, therefore, it is marred by trial errors, it should not be disturbed.

2. One of the errors alleged, which is worthy of special comment (although in substance embraced in the complaint of the verdict), is that the defendant stood self-condemned of culpable neglect because, although informed that the assets of the company were being diverted to improper purposes, he admits he did nothing. On its face this is a strong statement of condemnation. The meaning of the expression used by the defendant was, however, one to be interpreted by a jury. It might well not have (nor do we think it did have) quite the absolute significance given to it by the plaintiff. For the present we pass this without further comment, because embraced in a feature of the case to be later discussed with more fullness.

[2] 3. A feature of the trial which has more than a mere color of complaint of error is that of the standard of duty by which the jury were instructed to judge of the acts of the defendant. We are in accord with the proposition of counsel for plaintiff that the standard of duty is one prescribed by law, and the jury should have been instructed to apply the standard of the law, and not any standard of their own. If this standard was not laid down, and this instruction given, however, the charge wholly failed in its purpose. To foreclose the possibility of the error being made (which plaintiff complains was made) the jury were first instructed as to what the standard was and then directed to measure the conduct of the defendant by it. . A perusal of the charge confirms us in the thought that it is free from error in this respect. The further complaint, however, that the standard set in the charge was lower than that fixed by law, has some basis. That this was due to inadvertence of phrasing rather than to a misconception of the true standard we concede can make no difference.

[3] We are again in accord with counsel for complainant (although

counsel for defendant contest this) that the true standard is that set by the "ordinary director," and not the standard of the ordinary man on the street. This was the thought in mind and meant to be conveyed to the jury. We still think it was the thought conveyed, although it must be confessed the cold type of the transcribed charge leaves this in some doubt. The exigencies of the case compelled the statement and restatement of the thought with a reiteration which became painful. It was unavoidable that changes of phrase should be made. The expressions "ordinary director" and "ordinary man" were used alternately, if not indiscriminately. On the whole, however, we think the charge was understood in the sense intended. The attention of the jury was directed, in the effort to impress their minds with the importance of the case, to the two evils, one of a standard of responsibility so low as to be no standard at all, resulting in "dummy directors" and "directors who don't direct," and having it so high that the director of reasonable and ordinary capacity could not measure up to it, and, in consequence, driving away a class of men of whose services on directorates the business of the country should have the benefit. The jury were enjoined to get into their minds this standard of the law—that measure of attention, care, and ability which the ordinary director of corporations of this kind would be reasonably and properly expected to bestow upon the affairs of this corporation.

[4] There is this further thought to be suggested. If charges to juries, in cases the trial of which runs into weeks, are to be tested by the standard of absolute verbal accuracy in every isolated phrase, separated from its context and the general trend of the whole charge, few cases would come to a final judgment, or charges would become statements of abstract principles, absolutely meaningless and colorless to the jury, and take no vital hold on the merits of the case. Verbal slips, therefore, must on an appellate hearing be held to be innocuous, unless attention is called to them in time to have them corrected. It is too late to make the correction now.

[5] 4. The several remaining complaints (including again the one already mentioned under the numerical heading 2) may be bunched. Exception is taken to that part of the charge in which the court referred to a possible phase of the case as to which the jury might wish instructions. This was the case of a director acting in entire good faith in a management which was also free from complaints, other than of honest mistakes of judgment. The exception is that such instructions were aside from any fact features which called for them. As the plaintiff views the case, this is doubtless true. The defendant, however, strenuously insisted upon this theory, and his counsel urged it at length in his presentation of the defense. The transactions which the plaintiff arrayed as evidence of a plain exploitation of the company, negligently permitted by the directors to go on unchecked, the defendant argued were transactions all of which looked to be for the best interests of the company, and some of which were such as even the after-view judgment would approve. If some of them showed errors of judgment, they were the mistakes of honest judgments, which any careful, prudent director of good judgment might nevertheless

have made. We are still unconvinced how, without error, we could have ignored this phase of the defense as presented. Whatever view the trial judge may have had of this phase, it was the province of the jury to pass upon it. The further complaint of error in the charge on the subject of the bearing of a division of duties among the directors resolves itself into a complaint of the verdict. The jury were instructed that the affairs of a corporation were committed to its board of directors, and that no director could absolve himself from the discharge of any part of this duty by an arrangement among the directors, or any agreement with the officers or otherwise. The principle of organization and of division of labor applies to the work of corporations as well as to other work, and when it is applied through the appointment of committees having special duties, the fact enters into the case as one of the circumstances, in the light of which the action of the particular director is to be judged. The charge in this respect was as favorable to the plaintiff as, without successful complaint on the part of the defendant, it could have been made.

This brings us back to the second complaint. The corporation had two things, each of special importance. One was the management of its franchises; the other, the construction of its plant. The defendant was invited into its directorate because of his special equipment to look after the latter. He had no aptitude and knew his unfitness for the former. Men specially trained and well fitted to cope with the financial problems, but who in their turn knew nothing of the constructive work, had in charge its finances. The defendant doubtless felt that the one was his especial job; the other was the task of others. Noninterference with those in charge of special work, when confidence is justified, does not mean neglect or abandonment of the duty of supervision, but is sometimes its wisest exercise. As already stated, no complaint is made of that part of the management of this company with which this defendant had especially to do. The complaints which came to him of the financial management partook largely of a quarrel between the management and dissatisfied employés. When the defendant said he did nothing, it does not necessarily mean that he refused or neglected to interfere when interference was a duty; but it might well mean the mere statement of the fact that he took no definite action, and that an intelligent director, both willing and eager to do his full duty, situated as he was, would have seen neither occasion nor opportunity to do more than was done by him.

This case was tried as well as a case could be tried, the jury reached a conclusion which had the approval of their deliberate, carefully formed judgments, and we see no justification for interference by the court with the verdict.

The motion for a new trial is dismissed, and the defendant has leave to enter judgment in his favor, with costs.