## OTIS & CO. v. PENNSYLVANIA R. CO. et al.

### No. 3618.

District Court, E. D. Pennsylvania.

July 20, 1945.

Robert J. Bulkley, of Washington, D. C., and James F. Masterson and Simon Pearl, both of Philadelphia, Pa., for plaintiff.

Albert Ward, R. Sturgis Ingersoll, and John Dickinson, all of Philadelphia, Pa., for defendants.

KALODNER, District Judge.

This secondary, or derivative action was brought by Otis & Co., a stockholder in the Pennsylvania Railroad Co., against that Company, its officers and directors, and the Pennsylvania, Ohio and Detroit Railroad Co., and certain of its officers and directors. The latter is a wholly-owned subsidiary of the Pennsylvania Railroad. The matter is presently before the Court on a motion for summary judgment for consideration on the merits. Previously this Court determined an adjective issue in the instant case, and in the opinion, filed November 1, 1944, 57 F.Supp. 680, briefly described the interests and status of the parties. The statement therein is sufficient to suggest that the broad question involved is whether the individual defendants are liable for alleged

losses suffered by the Pennsylvania R. R. Co. arising out of the issuance and sale of over $28,000,000 in bonds by the Pennsylvania, Ohio and Detroit R. R. Co., which guaranteed the bonds.

The motion raises a preliminary question as to whether there now exists any genuine issue concerning a material fact, excepting, of course, amount of damages. Federal Rules of Civil Procedure, rule 56(c), 28 U.S.C.A. following section 723c. In addition to the pleadings, there are on record, admissions, affidavits, counter-affidavits, and certain exhibits, one of which is a transcript of proceedings before the Interstate Commerce Commission when the bond issue here in controversy was submitted for approval. Careful examination discloses no material issue of fact remaining with the exception of damages; the plaintiff conceded this at the oral argument (Transcript, page 101).

The Court has before it all the facts which a formal trial would produce and since this cause came on to be heard without a jury, and there is no substantial conflict concerning the evidentiary facts, but only as to the inferences to be drawn therefrom, this is a proper case for summary judgment. Fox v. Johnson & Wimsatt, Inc., 1942, 75 U.S.App.D.C. 211, 127 F.2d 729, 736, 737; see Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 1942, 130 F.2d 1016.

Approaching the main interests of this case, it is appropriate at this point, because of certain unusual characteristics, to set out the essential facts.

The Pennsylvania R. R. Co. (hereinafter referred to as P. R. R.) directly or indirectly owns all of the capital stock of the Pennsylvania, Ohio & Detroit R. R. Co. (hereinafter referred to as P. O. & D.) In the Spring of 1943, the latter company had outstanding a total of $28,483,000 "Series A" bonds, maturing April 1, 1977, bearing interest at the rate of 4½%, payable semi-annually, and redeemable on any interest payment date subsequent to April 1, 1932, at 102.5 upon 60 days' notice. This bond issue was guaranteed, both as to principal and interest, by P. R. R.

The possibility of refinancing this series of bonds had been under consideration by Mr. Clement, president of P. R. R., and Mr. Pabst, vice president in charge of finance of P. R. R. and president of P. O. & D., for approximately a year prior to June, 1943. During the latter part of April, 1943, the bond market became so favorable to refinancing that Clement directed Pabst to contact Kuhn, Loeb & Co. to determine whether it was possible to sell at a price not less than par, a new issue of P. O. & D. bonds, guaranteed by P. R. R., in the same amount as the Series A bonds but bearing interest not exceeding 3¾%. The negotiations with Kuhn, Loeb & Co. continued through May and part of June, the parties reaching an understanding, not legally binding, on the afternoon of June 22, 1943. On the following day the directors of P. O. & D. approved a resolution authorizing the sale of the new Series D 3¾% bonds, at the "best obtainable price," and the directors of P. R. R. approved a resolution authorizing a guarantee agreement. On the same day, June 23, 1943, the bonds were sold to Kuhn, Loeb and Co. at par and accrued interest from July 1, 1943, to date of settlement, subject to approval by the Interstate Commerce Commission.

It is not necessary here to set out in full the terms and conditions of the planned Series D issue; a complete discussion appears in the Interstate Commerce Commission's report, 1943, 254 I.C.C. 473. However, it may be said that the bonds were to mature July 1, 1968, and were to be redeemable as a whole only, except for the purposes of the sinking fund, upon 60 days' notice on any interest bearing date to January 1, 1959, at 105 and accrued interest, and thereafter at a premium. A sinking fund provision, not contained in the original Series A bond issue, specified that Series D bonds could be called at 103 and accrued interest, to and including July 1, 1956, and thereafter at a premium. The bonds were offered to the public at 101.75, a spread of 1.75. The last day for settlement under the contract was July 31, 1943, since the purchase price must have been received prior to the first publication of notice of redemption of the Series A bonds, on August 2, 1943, the redemption being effective upon such publication. According to the undisputed calculations and the Interstate Commerce Report, the refinancing would result in a net saving of $7,583,664.70, plus an estimated tax saving of $1,500,000.

On June 22, 1943, before the action by the directors and before the contract of sale to Kuhn, Loeb & Co. was executed, a Mr. Claflin, representing Halsey, Stuart & Co., Inc., visited Pabst in an effort to learn

whether there might be a refinancing of the P. O. & D. bonds, but Pabst declined to give any information and, in response to another question, stated that he did not think it was likely Halsey Stuart & Co. would have an opportunity to bid if there were a refunding. On June 23, 1943, Halsey, Stuart & Co. and Otis & Co. by telegrams to Clement and other directors of P. R. R. requested an opportunity to submit a competitive bid for the P. O. & D. bonds. The defendants assert that the telegram was not received until June 24th and on that day Clement telegraphed a reply to Otis & Co., acknowledging the joint telegram and advising that the "railroad has transacted the business referred to in a very satisfactory way, and in what is considered the best interests of the railroad." Subsequently, on June 28, 1943, Halsey, Stuart & Co. and Otis & Co., in a telegram addressed to Pabst and Clement, criticised a 25-year bond issue and offered to guarantee a price of 101, at a competitive bidding sale, for 3¾% 35-year bonds. Copies of the telegram were sent to the Interstate Commerce Commission. No reply was made by Pabst or Clement. Finally, on July 9, 1943, Halsey, Stuart & Co. and Otis & Co. sent a letter to Pabst offering to guarantee a minimum bid of 102 at a competitive bidding sale for the Series D bonds, subject to adjustment of call prices, or a minimum bid of 101 at a competitive sale for 34 or 35 year bonds; it invited a conference on desirable changes in terms and conditions and stated that the offer would be kept open until July 19. The letter further advised that copies were being sent to P. R. R., to its directors, and to the Interstate Commerce Commission.

Application to the Interstate Commerce Commission for approval of the Series D bonds was made by P. R. R. and P. O. & D. on June 25, 1943. Otis & Co., a stockholder of P. R. R., was granted leave to intervene, but such leave was denied Halsey, Stuart & Co. The issues presented to the Commission are briefly summarized in the Commission's report, 254 I.C.C. 473 at page 477:

"The intervener contends that this application is one where the conditions are such as to make competitive bidding imperative and asks that we so decide, while the applicants insist that a refunding issue is peculiarly inappropriate for competitive bidding, because the publicity incident to that method of sale would disrupt the market for the bonds to be called and refunded before definite arrangements for the refunding could be consummated. The applicants argue that the question is whether the proposals contained in the pending application are such as show that sufficient savings will result therefrom, while the intervener contends that the application should be denied because savings would be greater if a higher price had been received for the bonds, and that the failure of the Pennsylvania to consult with more than one banker was a disservice to the stockholders."

A majority of the Commissioners were not convinced that the applicants received the best possible price and felt that because of negotiations with only one investment house the applicants failed to explore the possibility of effecting greater savings, such as through the issue of serial bonds. However, they determined that competitive bidding was not appropriate, but could find no reason why more than one investment house should not have been consulted. They also found that the transaction with Kuhn, Loeb & Co. was "the result of arms-length dealing," and that the offers submitted by "a rival investment company" were made on the spur of the moment and without adequate consideration; therefore, because of the debt reduction provisions and because the sale would result in a saving of approximately 9 million dollars which might not be realized if approval were withheld, it was determined to approve the sale at a price not less than 100¼, considering the spread of 1¾ to be too great. This price was considered just and reasonable. One Commissioner dissented. 1943, 254 I.C.C. 473.

The gist of the complaint is that the individual defendants failed and refused to exercise ordinary care and judgment in the sale of the Series D bonds. The individual defendants, it is alleged, kept secret the bond issue and refused to deal with any investment house other than Kuhn, Loeb & Co. Furthermore, it is charged that as a result of failing to "shop around," a half million dollars was lost, and another half million dollars was lost in failing to put the issue to competitive bidding. In addition, it is also asserted that certain of the directors were influenced because of their position as directors of several institutions which had made agreements with Kuhn, Loeb & Co. to purchase and/or sell part of the bond issue.

In reply, the defendants contend that the transaction was an honest exercise of judgment, that the procedure followed was similar to that generally pursued by railroads, and that it was particularly desirable here. Adverse interests on the part of certain directors is denied.

█ The defendants, however, go further and invoke what amounts to the doctrine of res adjudicata; as they stated it: "The jurisdiction of this Court is excluded in the present case by the fact that the same issues were presented to and decided by the Interstate Commerce Commission, under its statutory authority, with the same objecting stockholder before it, and the Commission's order of approval, not having been subjected to judicial review in the manner provided therefore by statute, has become judicially unassailable and not subject to collateral attack in this proceeding." It should be pointed out that the plaintiff does not attack the validity of the Commission's determination, nor does it seek to have the order set aside. In fact the plaintiff cites the Commission's opinions, both majority and minority, as supporting its contentions.

As to the defendants' res adjudicata defense, it may be noted at once that that theory was rejected by the United States Supreme Court in the case of Pittsburgh & W. Va. Ry. Co. v. United States, 1930, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980. There, a minority stockholder intervened in a Commission proceeding involving the establishing of a union passenger station at Cleveland, and alleged, inter alia, that the contracts by the Wheeling & Lake Erie Ry. Co. were made in violation of the law of Ohio, the Wheeling directors did not give Wheeling the benefit f unbiased judgment, Wheeling the benefit of unbiased judgment, adequate and not the best obtainable. 281 and the price for Wheeling's site was in-transaction and the stockholder sought an injunction under the Urgent Deficiencies Act, 1913, 38 Stat. 220, 28 U.S.C.A. § 47. On direct review, the Supreme Court said, 281 U.S. at page 488, 50 S.Ct. at page 381, 74 L.Ed. 980:

"Second. The prayer that the contemplated action of the Wheeling should be enjoined because its directors hold office illegally, are faithless to their trust, are acting in violation of the rights of stockholders under the Ohio law, and, hence, that the Wheeling could not legally exercise the authority granted to it by the Commission, was not properly joined in this suit and is not subject to review in this Court on a direct appeal. An application for such relief may not be included in a bill under the Urgent Deficiencies Act to set aside an order of the Interstate Commerce Commission. (Citing cases). *It is neither ancillary to nor dependent upon the judgment as to the order. Relief of that character may be had only in a suit invoking the plenary equity jurisdiction of the District Court.* Such a suit would be heard in ordinary course by a single judge; and it would be appealable only to the Circuit Court of Appeals." (Emphasis supplied.)

The Supreme Court thereupon dismissed that part of the bill without prejudice. See also, New York Central Securities Corporation v. United States, 1932, 287 U.S. 12, 28, 29, 53 S.Ct. 45, 77 L.Ed. 138, the final decision in a series of actions beginning with Cleveland, C., C. & St. L. Ry. Co. v. Jackson, 6 Cir., 1927, 22 F.2d 509, on which the defendants rest heavily. Since an intervening minority stockholder is not, in an injunction proceeding, entitled to judicial review under the Urgent Deficiencies Act on questions such as breach of fiduciary duty, and since such questions are not "ancillary to nor dependent upon the judgment as to the order," it follows that the plaintiff here has properly sought to enforce its rights in this action, and that the proceedings before the Interstate Commerce Commission are not res adjudicata. See, Casey v. Woodruff, Sup., 1944, 49 N.Y.S.2d 625, 640–642.

The Commission, under the statutory authority here involved, Act Feb. 28, 1920, 41 Stat. 494, 49 U.S.C.A. § 20a,[1] does not determine private rights. In Casey v. Woodruff, supra, a case strikingly similar to the present controversy, Justice Shientag, in a well considered and authoritative opinion, stated, 49 N.Y.S.2d at page 642:

"In formulating plans for the issuance and sale of the securities of a railroad, the

---

[1] Subdivision (2) of this section provides that the Commission shall make an order authorizing, inter alia, assumption of obligations, only if it finds that such assumption, "(a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary ✻ ✻ ✻ for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and

board of directors necessarily must consider the public interest because the railroad is engaged in public service. Obviously, it would be futile to propose a security issue which the Commission would be bound to disapprove as not 'compatible with public interest' or with the proper performance by it of service to the public. § 20a. To summarize what has been said on this point, it is clear that in determining that the proposed issue of Series D bonds was improvident and unwise the Commission, whether its action was based wholly or in part on the public interests, did substitute its own judgment for that of the directors. It did not, however, purport to pass upon the personal liability of the directors for alleged breach of fiduciary duty, nor did it have the slightest basis of jurisdiction for that purpose." [2]

■ So much then as to the defendants' theory of res adjudicata. It is further urged on behalf of the defendants that under the circumstances the instant action is tantamount to a complaint that it was an abuse of discretion for the defendants to have followed the judgment and order of the Commission. However, the "order" here referred to was not mandatory, but permissive, in that the Commission merely authorized the sale. While it may be true that the public and private interests overlapped and that the latter were considered in some degree by the Commission, it is readily apparent from a reading of its report that it recognized different standards were applicable depending upon whether the interest of the public or of the private shareholder was involved. There may, indeed, be a real difference between what is required in the public interest and what is necessary to satisfy stockholders, and although the Commission authorized the sale,

that does not foreclose possible liability of the officers and directors for negligent breach of their fiduciary duty.[3]

Coming now to the final question, that is, whether the officers and directors are guilty of negligent mismanagement, it should be noted that of the fifteen individual defendants, twelve are officers and/or directors of P. R. R. and three are directors of P. O. & D.; of the fifteen, four are officers and/or directors of P. R. R. and P. O. & D. This fact is noteworthy because P. R. R. is a Pennsylvania corporation while P. O. & D. is incorporated in the States of Ohio and Michigan. Since the allegations of the complaint deal solely with the internal affairs of the two corporations, the liability of the respective officers and directors must be determined under the corporation laws of the states wherein the associations were organized.

■ In Pennsylvania, the relation of officers and directors to the corporation is stated in the Business Corporations Law 1933, P.L. 364, art. IV, § 408, 15 P.S. § 2852—408, as follows:

"Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs."

The state of the prior law, and the extent to which this statute changes it is uncertain,[4] but the test of liability can hardly be different from that applied in Hunt v. Aufderheide, 1938, 330 Pa. 362, 366, 199 A. 345, 347, where, in applying the law prior to the statute, it was stated that:

" 'The directors of a corporation are required to exercise reasonable and ordinary

appropriate for such purpose." In New York Central Securities Corporation v. United States, supra, the Supreme Court determined, 287 U.S. at page 27, 53 S.Ct. at page 49, 77 L.Ed. 138, that "lawful object within its corporate purposes" does not refer to state limitations upon corporate purposes, but rather to the general field of corporate purposes.

2 Berg v. Cincinnati, N. & C. Ry. Co., D.C.E.D.Ky., 1944, 56 F.Supp. 842, 848, is not inconsistent.

3 See Atchison, T. & S. F. Ry. Co. v. Scarlett, 1937, 300 U.S. 471, 57 S.Ct. 541, 81 L.Ed. 748. Defendant was not liable under the Safety Appliance Act, 45 U.S. C.A. §§ 11, 12, where it had complied with

the pertinent Interstate Commerce Commission regulation, but the fact that there was compliance did not necessarily constitute a defense to an action for negligence.

4 See 2 Segal, Pennsylvania Banking and Building and Loan Law (1941) Sec. 518. See also Swentzel v. Penn Bank, 1892, 147 Pa. 140, 23 A. 405, 415, 15 L.R.A. 305, 30 Am.St.Rep. 718; Allen v. Roydhouse, D.C.E.D.Pa., 1916, 232 F. 1010. At least by including in the statute the phrase "in their personal business affairs" it would seem the distinction drawn in the latter case between the ordinary individual and the ordinary director was eliminated.

care, skill, and diligence in conducting its business, and the failure to observe this standard of care imposes liability on a defaulting director,' Fell v. Pitts, 263 Pa. 314, 319, 106 Pa. 574, 575; that is, *the care, skill and diligence which the ordinary prudent man would exercise in similar circumstances."* (Emphasis supplied.)

And see, South Penn Collieries Co. v. Sproul, 3 Cir., 1931, 52 F.2d 557, 561.

The statutory rule is not unlike that long in use in New York. See 3 Fletcher, Cyclopedia of the Law of Corporations (1931) Sec. 1037; Hun v. Cary, 82 N.Y. 65, 37 Am.Rep. 546; Casey v. Woodruff, supra. In the latter case, the plaintiff sought to recover, on the ground of negligence, expenditures made by officers and directors preparatory to floating a bond issue, for which permission was denied by the Interstate Commerce Commission. In disposing of the case under the New York Law, the concept familiarly known as the "business judgment rule"[5] was applied by the court, 49 N.Y.S.2d at page 643:

"The question is frequently asked, how does the operation of the so-called 'business judgment rule' tie in with the concept of negligence? There is no conflict between the two. When the courts say that they will not interfere in matters of business judgment, it is presupposed that judgment —reasonable diligence—has in fact been exercised. A director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment. Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them."

In view of the Pennsylvania statute it seems that the application of this theory is warranted in the instant case.

■■■ In any event, it is well settled that what constitutes negligence depends upon the circumstances of the case, South Penn Collieries v. Sproul, supra; that the court will not interfere with the internal management of corporations, and therefore will not substitute its judgment for that of the officers and directors, Bowman v. Gum, Inc., 1937, 327 Pa. 403, 193 A. 271; and, what is a rule of reason, that negligence must be determined as of the time of the transaction. It is also clearly established that mistakes or errors in the exercise of honest business judgment do not subject the officers and directors to liability for negligence in the discharge of their appointed duties. The rule was succinctly stated by Justice Shientag in Casey v. Woodruff, supra, 49 N.Y.S.2d at page 642:

"The directors are entrusted with the management of the affairs of the railroad. If in the course of management they arrive at a decision for which there is a reasonable basis, and they acted in good faith, as the result of their independent judgment, and uninfluenced by any consideration other than what they honestly believe to be for the best interests of the railroad, it is not the function of the court to say that it would have acted differently and to charge the directors for any loss or expenditures incurred."

■■■ On the matter of good faith, it seems to me there can be no doubt that the officers and directors of both P. R. R. and P. O. & D. acted honestly, in good faith, and sought to exercise their judgment for the best interests of the respective railroads. There is no contention here that fraud was present; indeed, the allegations in the complaint contain only a faint suggestion of bad faith, calling to the attention of the court that the officers and directors were influenced because of their position as directors or officers of several companies which had made purchase and sale agreements with Kuhn, Loeb & Co. However, it clearly appears in the record of the I.C.C. proceedings that Kuhn, Loeb & Co. had not made known to Pabst who were to be the underwriters and sales agents for the particular bond issue. Moreover, in their affidavits these men disaffirm that they had anything to do with such agreements either directly or indirectly, or that they discussed railroad matters with their other interests. With respect to Colonel Mellon and the Mellon Securities Corporation, plaintiff has brought to the court's attention certain penal statutes, but this court cannot concern itself with those statutes except insofar as they declare the public policy. Nevertheless, there is no doubt, and the plaintiff admits, that Col. Mellon, although a director of P. R. R. was absent in the armed services and had nothing whatever to do with

---

[5] See Carson, Current Phases of Derivative Actions, (1942) 40 Mich.L.Rev. 1125; Carson, Further Phases of Derivative Actions, (1944) 29 Corn.L.Q. 431.

this transaction; he did not take part in any phase of it, nor was he present at the board meetings, when the matter was considered, nor did he vote. Aside from his mandatory absence, it is evident nothing more could be done to relieve Col. Mellon of all implications of bad faith. The Interstate Commerce Commission reached a like conclusion on this matter.

Applying the principles stated, I find no negligence on the part of the officers and directors.

■ Parenthetically it may be stated that with respect to those defendants who are directors of P. O. & D., the standard of care, skill and diligence in Ohio and Michigan is no greater than that by which I have tested the liability of the officers and directors of P. R. R. See Goff v. Emde, 1928, 32 Ohio App. 216, 167 N.E. 699, citing 3 Thompson, Corporations (3rd ed.) Sec. 1520; 3 Fletcher, Cyclopedia (1931) Sec. 1037 n. 64.

■ It was the duty of the officers, in the course of business, to be on the alert for an opportunity for refunding an outstanding bond obligation in a manner which would result in a saving to their business, and there is no question that the management of the defendant corporations did seize an opportune time for the refunding operation. Clement, the president, and Pabst, the vice president in charge of finance and corporate relations, were obviously well acquainted with the finances of the railroad. They had in mind the refunding plan for approximately a year prior to its consummation; they acquainted themselves with market conditions, and surveyed the situation with respect to P. R. R. and other bonds which bore some resemblance to that which they proposed to issue. On the basis of their knowledge and investigation Clement concluded they could market the $28,000,000 issue of 3¾% bonds at par, and he directed Pabst to negotiate with Kuhn, Loeb & Co. As a result of arms-length dealing, Clement obtained what was considered the "best obtainable price." At the P. R. R. and P. O. & D. board meetings of June 23, 1943, full disclosure of the facts was made, and the directors, experienced men in the field of finance and business, acting on the basis of their own knowledge and on the recommendations of the officers, authorized the sale and guarantee. Although the P. R. R. board author-

ized the guarantee of a bond issue, the terms and conditions of which were to be settled by the P. O. & D. board, and the P. O. & D. board authorized a sale at the "best obtainable price," it is evident that they were aware of the tentative agreement which Pabst and Clement had made with Kuhn, Loeb and Co.

The plaintiff contends that this is not a case of error in business judgment, but rather it is a case where there was no satisfactory collection of data or information on which judgment could have been exercised. Furthermore, plaintiff asserts, the only proper way to determine the actual "best obtainable price" was to obtain offers from more than one investment house; this could be done by "shopping around," or better, by submitting the issue to competitive bids. In support of this contention, plaintiff cites the admission of the defendants that the bond issue involved was actually a "test" of the bond market, since no large bond issue had been marketed for some time previously.

■ That recourse was not had to competitive bidding does not, of itself, afford a basis of liability. Casey v. Woodruff, supra. It is highly significant that the Interstate Commerce Commission refused to require competitive bidding, although plaintiff earnestly urged it to do so. I have already set out at length, in my opinion of November 1, 1944, 57 F.Supp. 680, at page 682, the view of the Commission and its justification of the refusal of the defendants to require competitive bidding; it is only necessary to repeat my summation, "The manner in which the defendant corporations floated the bond issue has been in use * * * almost since 'Iron Horse Days'—it is apparently a matter of corporate policy pursued by railroads generally." That the Commission later passed a regulation requiring competitive bidding [6] does not aid the plaintiff, for the Commission also found that competitive bidding was not appropriate because of the possible effect on the market of the bonds to be called and refunded. 254 I.C.C. 473, 479. On this, I may accept the opinion of the Commission as an expert department of the government.

■ The defendants unquestionably had the right to negotiate privately with Kuhn, Loeb & Co. Although there is no charge of bad faith, or conspiracy, it seems clear that in choosing that firm, the defend-

---

[6] 9 F.R. 7205 Appendix, June 29, 1944.

ants were following another custom in railroad history. See In re Competitive Bidding, 1944, 257 I.C.C. 129, 153, 156. Kuhn, Loeb & Co. have long been "the" banking house to P. R. R.[7] In dealing with Kuhn, Loeb & Co. the defendants were dealing with a firm in which they had the confidence of years of satisfactory banking relations and which was well acquainted with their financial situation, structure and requirements. Although the Commission felt no special advice was necessary, the record of the Commission's proceedings reveals that from time to time Kuhn, Loeb & Co. did advise the railroad company as to their estimate of the market, what it might absorb, the trend, and the terms of bonds and similar matters. Again, the finding of the Commission on this matter may be considered determinative, 254 I.C.C. at page 481:

"2. There is no suggestion in the record that the Pennsylvania, with an investment of over 3 billion dollars, is under any obligation to any banker; rather, the proposed transaction is the result of armslength dealing between competent parties in which negotiations covering a considerable period culminated in a mutually satisfactory purchase and sale at a price confirmed by applicants' boards of directors composed of able businessmen."

It may also be noted that in dealing with Kuhn, Loeb & Co., defendants were not contracting with another firm in which they were interested, nor did the directorates or managerial positions interlock. There is no contention that fraud existed and fraudulent acts will not be presumed. Casey v. Woodruff, supra, 49 N.Y.S.2d at page 645.

As to the plaintiff's contention that the Commission was not convinced that the best obtainable price was received by the railroads, it is indeed difficult to determine in what way the Commission construed the words "best obtainable price". However, it is at once evident that the Commission substituted its judgment for that of the directors' in increasing the price, and while this may be done by that body, see Casey v. Woodruff, supra, 49 N.Y.S.2d at page 641, it is well settled that

the courts will not similarly engage themselves. On the matter of the spread, at the hearings before the Commission there was submitted a tabulation showing an average spread of 1.2841 in four transactions where the bond issue was submitted to competitive bidding. Nevertheless, it appears that in one of the four instances the spread was as high as 1.9423. It can hardly be concluded that a spread of 1.75 even suggests negligence, especially where, as here, leeway must have been allowed for the risk in undertaking a large issue which "broke the ice" in the bond market. Insofar as the fact that the bonds were favorably received is concerned, it is clearly true that the monetary situation and the condition of the market are not exactly foretellable. Failure to foresee what at best is uncertain does not constitute negligence or mismanagement: what the market would absorb and the terms and conditions that would meet with greatest success were, at the time the issue involved here was planned, at most a matter of judgment; now they are fact. If the defendants used their honest business judgment, as I am convinced they did, they cannot be liable for failing to accurately foretell the welcome the market would give their efforts. I am of the opinion no more was required of the individual defendants.

In summary then I find that the bond issue was adequately deliberated and planned, properly negotiated and executed; there was no lack of good faith, no motivation of personal gain or profit; and there was no lack of diligence, skill or care in selling the issue at the price approved by the Commission, and which resulted in a saving of approximately $9,000,000 to the corporations. The various directors were aware of the proposed transaction and its course of conduct; copies of telegrams and letters from Halsey, Stuart & Co., and Otis & Co. were sent to them; in any event they had a right to rely on the information supplied by, and the good faith judgment of, those in whose hands the conduct of the everyday affairs of the corporation was placed.

For the reasons stated, the defendants' motion for summary judgment is granted.

---

[7] See Hearings before the Committee on Interstate Commerce, pursuant to S.R. 71 (74th Cong.), Part 18, page 7687 (1937–38).