872

S. Burton SPIRT, Plaintiff,

v.

S. D. BECHTEL, C. F. Bradley, Howard Bruce, John M. Franklin, V. J. Freeze, C. D. Gibbons, Herman Goldman, John W. Hanes, R. M. Hicks, Cletus Keating, A. J. McCarthy, G. F. Ravenel,

Mary Dempsey Harris and United States Trust Company of New York, as executors of the estate of Basil Harris, deceased,

Helen Whitney Gibson and Manufacturers Trust Company, as executors of the estate of Harvey D. Gibson, deceased,

Louis Walker, Elisha Walker, Jr., and Robert E. Walker, as executors of the estate of Elisha Walker, deceased,

Richard Roe I and Richard Roe II (names being fictitious, true names being unknown to plaintiff) and S. D. Bechtel, as executors of the estate of K. D. Dawson, deceased, and

United States Lines Company, Defendants.

United States District Court,
S. D. New York.

March 25, 1955.

Louis H. O. Fischman, Pomerantz, Levy & Haudek, New York City, for plaintiff. William E. Haudek, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendants. Ralph L. McAfee, Alexander S. Andrews, Edward Q. Carr, Jr., New York City, of counsel.

PALMIERI, District Judge.

This is a stockholder's action to recover for the benefit of United States Lines Company (U. S. Lines) from directors and officers of U. S. Lines for alleged loss by and damage to that company. Plaintiff alleges that U. S. Lines was damaged because of (1) unlawful compensation paid to the personal defendants and others by U. S. Lines under a stock option plan involving shares of stock in the company, (2) a transaction with the Commissioner of Internal Revenue which was prejudicial to the company and concerned certain tax aspects of the stock option plan, and (3) improper grants of free and reduced rate ship passages.

The nominal corporate defendant, U. S. Lines, is a New Jersey corporation engaged in marine transportation of passengers and freight. The individual defendants are nine of the directors of U. S. Lines who served during the period 1943–1948 and the estates of three other such directors. There was no service of the summons and complaint upon Messrs. Bechtel, Bruce and McCarthy and the executors of Mr. Dawson nor has there been any appearance by them.

Involved in the instant case is the operation of a stock option plan that U. S. Lines adopted in 1943. The plan authorized the board of directors of U. S. Lines to grant to key employees options to purchase a total of 125,000 shares of the company's common stock at a price not less than the average of the closing prices on the New York Stock Exchange for the thirty consecutive trading days preceding the date of the board's resolution granting the options. The term of the options was not to exceed five years and unexercised options were to expire upon termination of an optionee's employment. The plan was adopted by overwhelming majorities at special meetings of stockholders.

It is not disputed that the stock option plan had a declared and valid corporate purpose—namely, to provide an inducement to key employees to remain in the company's employ or, in the case of employees temporarily absent on war service, to return to the company at the end of such service, and to encourage diligent service by such employees. The plan was adopted during the height of the war effort when the problem of retaining and reacquiring qualified personnel was acute. But plaintiff contends that the profits that defendants and others have realized as a result of the stock option plan were unlawful because they were received in violation of section 805(c) of the Merchant Marine Act of 1936, 49 Stat. 2013 (1936), as amended, 52 Stat. 963 (1938), which provided civil and criminal penalties for corporations and others who wilfully caused a subsidized company to pay more than $25,000 to any of its officers, directors, or employees.

The plaintiff argues that since, at the time the options were exercised, the market value of the shares acquired by the optionees exceeded the option price paid for them, the defendants and the other option holders received "compensation" within the meaning of former section 805(c). To the extent that this "compensation" resulted in giving the optionees a total annual "compensation" that was in excess of $25,000 it was illegal, says the plaintiff, and should be returned to the company, U. S. Lines.

In my opinion there was no violation of section 805(c) of the Merchant Marine Act of 1936. In 1945 U. S. Lines sought and obtained an opinion from the

General Counsel of the United States Maritime Commission in which the General Counsel said:

"I am therefore of the opinion that if and when your employees exercise their option, the amount, if any, by which the market price of the shares of common stock of your company exceeds the option price, is not to be considered compensation for services received by such employees within the meaning of Section 805(c)."

I agree with the conclusion of the General Counsel that the profits realized as a result of the exercise of these stock options by defendants and others were not "compensation" within the meaning of section 805(c). Furthermore, I agree with and adopt the reasoning by which the General Counsel arrived at this conclusion. He said:

"The primary purpose of Section 805(c) is to prevent the diversion in any form of the assets of subsidized operators or any affiliated or associated company by way of payment of compensation to the management in excess of $25,000 per year with respect to any one director, officer, or employee. The word 'compensation' is to be construed very broadly in order to correct the evils against which the statutory provision is aimed. Accordingly, if a subsidized operator disposes of any of its assets to its employees at less than what could fairly be obtained for it from third parties, there would be a very strong presumption, perhaps an irrebuttable one, that the difference between the value of the assets received and the consideration paid would be compensation for personal services within the meaning of Section 805(c). I believe this principle would be applied by the Commission to a subsidized operator's treasury stock (that is to say, stock previously issued and reacquired) and to any stock which it holds in subsidiary corporations. I believe, however, that it is beyond the intent and purpose of the statute to apply such principle to authorized unissued stock. Such stock is not, in any real sense, part of the property of the corporation. It is, at most, a provision for the interest of the stockholders as a whole in the assets of the corporation. The sale of unissued treasury stock does not, in any way, deplete the assets of the corporation. On the other hand, it increases the resources available for subsidized operations by the amount of consideration paid by its purchasers.

"In a prior opinion of the General Counsel, it was ruled, upon somewhat similar reasoning, that payment of compensation to officers by a holding company, parent of the subsidized operator, was not within the prohibitions of the statute unless such parent was by reason of other relationships to be considered an affiliated or associated company. If it is true that a parent holding company is not subject to the Act, it is obvious that the individual stockholders of the subsidized operator are not included among the persons from whom compensation may not be received by the management except subject to the limitations of Section 805(c). Obviously, the stockholders could, without coming within the ambit of Section 805(c), each contribute a portion of their stock interest for the benefit of the employees. It seems to me that, in practical effect, this is all that is being done when the stockholders of a corporation authorize the directors to issue the common stock of the corporation upon advantageous terms to certain of the employees. Such action on the part of the stockholders has at most the effect of diluting their previous interest in the corporation. It does not deprive the corporation of a single asset and, as stated above, has the contrary effect of increasing the total assets of the

company." See plaintiff's exhibit No. 47.

Plaintiff's second cause of action also involves the stock option plan adopted in 1943. From the time .the stock option plan was first considered the question of the tax consequences of the plan to the prospective optionees and U. S. Lines was given careful consideration. Defendants knew that if the stock option plan were held to be one which provided for "compensation" to the optionees, the optionees would have to pay income taxes at the normal and surtax rates on the difference betwen the market price and the option price at the time the options were exercised, and U. S. Lines would be entitled to deduct that amount from its gross income. Defendants also knew that if the stock option plan were held non-compensatory in nature, the optionees would only have to pay income tax at the capital gains rate on the profits from any sale of the optioned stock and U. S. Lines would not be entitled to any deduction because of the options. To a great extent the stock option plan was attractive because of the favorable tax consequences to the optionees that might result from its operation.

Until May 31, 1946, when the Commissioner of Internal Revenue ruled on the tax consequences of the U. S. Lines stock option plan, those consequences could not be predicted with any degree of certainty. On the one hand there were cases like Albert R. Erskine, 1932, 26 B.T.A. 147, holding that stock option profits were "compensation" to the optionees. On the other hand there were cases like Delbert B. Geeseman, 1938, 38 B.T.A. 258, and Herbert H. Springford, 1940, 41 B.T.A. 1001, holding that stock option profits were not compensation to the optionees. Nor did the Supreme Court's opinion in Commissioner of Internal Revenue v. Smith, 1945, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, clarify the law in this area. The Court assumed that the stock options involved in that case were given "as compensation for * * * services." See 324 U.S. at page 177, 65 S.Ct. at pages 591, 593.

After the Supreme Court's decision in the Smith case, the Treasury Department issued I.T. 3795, 1946–1 Cum.Bull. 15, advising the public how the Bureau of Internal Revenue would treat (1) stock option profits resulting from options granted after the Smith case was decided by the Supreme Court and (2) stock option profits resulting from options granted before the date of the Smith case decision. The I.T. said,

" * * * in view of the prior development of the regulations and interpretations relative to employee stock options * * * as respects an option granted to an employee prior to February 26, 1945 (the date of the Smith case decision), unless * * * the employee would otherwise clearly realize income by way of compensation through the exercise or transfer of the option, this office will hold that the exercise or transfer of such option, as the case may be, does not result in income to the employee by way of compensation * * *, provided, however, that on or before July 1, 1946, the employee to whom such option is granted and any transferee thereof, and the employer corporation or any other taxpayer who granted such option to the employee, file * * * with the Commissioner of Internal Revenue * * * written consents (1) agreeing that the basis to the employee, and to any transferee of the option, for the stock acquired or to be acquired pursuant to the option shall be the actual price paid therefor and that no deduction shall at any time be claimed attributable to any aspect of the option arrangement, under section 23(a) (1) [26 U. S.C.A. § 23(a) (1)] or any other subsection of the Internal Revenue Code, by the employer corporation or the taxpayer who granted the option * * *." See 1946–1 Cum. Bull. 15, 17.

The defendants realized that I.T. 3795 made it possible for them to get an authoritative and binding ruling on the tax

consequences of the U. S. Lines stock option plan. They sought such a ruling, and the Commissioner of Internal Revenue ruled on May 31, 1946 that it did not appear that the optionees "clearly realized income by way of compensation through the exercise or transfer of the options held by them." The ruling concluded,

> "In view of the foregoing it is held that no 'income' will be realized by your officers and employees upon the exercise or transfer of the options in question provided that such officers and other employees and you as their employer each file on or before July 1, 1946, the consents required under the provisions of * * * I.T. 3795." See plaintiff's exhibit No. 72.

The optionees submitted the requisite consents and defendant Hicks, an optionee, executed and acknowledged the company's consent not to claim any tax deduction attributable to the stock options. This was done without seeking the approval of U. S. Lines' board of directors, stockholders, or any committee of the board.

Plaintiff contends that the option profits constituted "compensation" and that, but for the filing of the consent that U. S. Lines would not claim a tax deduction, the option profits would have been deductible from U. S. Lines' taxable gross income. By filing this consent and their individual consents the defendants, so the argument runs, caused the company to surrender its right to claim this tax deduction, and secured for themselves favorable tax treatment. Therefore, plaintiff argues, the defendants are accountable to U. S. Lines for the tax loss to the company and for their tax savings.

I shall assume for the purposes of this case that the option profits would have been held "compensation" if the issue had been put before the courts, and that U. S. Lines would therefore have been entitled to deduct the amount of the op-

tion profits from its gross income. But this does not aid the plaintiff.

The stock option plan was adopted by huge majorities at a special meeting of the stockholders of U. S. Lines held on May 20, 1943. Before that meeting the stockholders had been fully informed as to the purposes of the plan and, in a general way, how the plan would operate.

The stockholders authorized the board of directors to grant options pursuant to the plan for a period which ended within about one year from the date the plan was approved. Within the one-year period the board allocated options on all but 28,750 shares of the stock subject to the plan. Thereafter, at the annual meetings of stockholders held in 1944, 1945, 1946, and 1947, the stockholders voted to extend the authority of the board of directors to grant options on the 28,750 shares of stock on which options had not been allocated previously. Each year, before they voted to extend the board's authority, the stockholders were informed of the stock purchase plan, the number of shares of stock on which options had been granted, and the number of shares of stock on which options had been granted to each individual who had served as a director of the company during the year prior to the meeting.

Thus, it is apparent that the stockholders were fully aware of the stock option plan and approved of it. And in approving the plan they also must be deemed to have concurred in its tax consequences, whatever they might be, and in all steps that the directors and officers might reasonably take to implement the plan. Defendant Hicks' signing of the corporation's consent not to claim a deduction on account of the option plan was such an act of implementation. For, as we shall see, by filing the consent the corporation did not give up any clear right to a deduction on account of the plan. Rather it clarified the tax consequences of the option plan so that its ultimate goal, as expressed in the notice to the stockholders, of serving as "an inducement to * * * officers and em-

ployees to continue in the employ of the Company and * * * to return to active duties with the Company, and to encourage all to strive more diligently for its increased success" could be realized.

Plaintiff's claim that the filing of the consent was a breach of defendant's fiduciary duties to the corporation and its stockholders rests in the final analysis on his contention that U. S. Lines had a clear right to a deduction on account of the option plan. However, cases like Delbert B. Geeseman, 1938, 38 B.T.A. 258 and Herbert H. Springford, 1940, 41 B.T.A. 1001, which preceded the Supreme Court's decision in the Smith case, and cases like Philip J. LoBue, 1954, 22 T.C. 440 and Abraham Rosenberg, 1953, 20 T.C. 5, which were decided after that decision, show that U. S. Lines did not have any clear right to a deduction on account of the stock option plan. Indeed, the fact that the Commissioner of Internal Revenue ruled that it did not appear that the optionees under the U. S. Lines plan "clearly realized income by way of compensation through the exercise or transfer of the options held by them" is convincing proof that the corporation never had any clear right to a deduction on account of the plan. In the light of these facts the filing of the consents required by I.T. 3795 by the corporation and the optionees was an act the performance of which was clearly within the discretion of the officers of the corporation in implementing the stockholder approved option plan. See Lynch v. Sapiro, 1935, 117 N.J.Eq. 485, 176 A. 327; Otis & Co. v. Pennsylvania R. Co., D.C.E.D.Pa.1945, 61 F.Supp. 905, affirmed on opinion below, 3 Cir., 1946, 155 F.2d 522.

Plaintiff makes some claim that in any event defendants should have sought the consent of the board of directors or of a committee of the board before filing the corporation's consent not to claim a deduction on account of the plan. That claim is without merit. As I have said, Mr. Hicks was implementing the stockholders' resolution setting up the stock option plan when he filed the consent for the corporation. Moreover, plaintiff has failed to show that the directors would have disapproved of the filing of the consent. Indeed, it seems clear that they would have approved for they were aware that one important reason for the adoption of the plan was to secure favorable tax consequences for the optionees. Without a showing that the directors would or were likely to have disapproved of filing the consent the failure to secure their approval becomes at most a technicality. Substantial liabilities should not be based on such a technical omission, if omission it was.

Lastly, the plaintiff complains that the directors and officers have violated their duty to U. S. Lines with respect to the grant of free and reduced passages. The scope of this claim was narrowed after the trial. The following is the statement of plaintiff's counsel appearing in its principal brief submitted after the close of the trial:

"In order to simplify the issues, we shall press no claim for the free passages allowed to outsiders (such as the officials of other steamship lines and railroad companies) since, in return for accommodating them, the Corporation received reciprocal accommodations (T. 152, 158). Our claim is confined to the free and reduced rate passages allowed to the directors, their family members and other retinue."

It was undisputed by the defendant that free and reduced rate passages were granted in a number of instances. This was always done, however, under the active supervision of the president of the company and pursuant to business policies which the defendant claims were both legal and proper.

At the outset, it should be pointed out that such grants had been permitted by custom and usage in the maritime and other transportation industries. The company, as a member of the Atlantic Conference and of the Transatlantic

Passenger Conference, associations of transatlantic steamship passenger carriers, acted pursuant to regulations governing the granting of such passages and made periodic reports with respect to them. The adherence of the company to these regulations must be deemed to have been known to and approved by the Federal Maritime Board and its predecessor, the Maritime Commission, in accordance with section 15 of the Shipping Act of 1916, 39 Stat. 733 (1916), as amended, 49 Stat. 2016 (1936), 46 U.S.C.A. § 814. Voluminous exhibits were submitted upon the trial, showing that detailed reports were made by the company with respect to all free or reduced rate passages as part of the procedure for the regulation and control of that activity under the Atlantic Conference Agreement to which the company and other carriers were parties. Directors of the company and their families were generally carried free of charge because it was believed that such transportation would encourage them to familiarize themselves with the operation of the vessels and enhance their interest in the company. The president of the company, General Franklin, testified that directors and their families were generally carried free of charge because:

"It made them more interested in the company. We have some very high-class directors. Their remuneration was small, and we were anxious to keep their interest and be able to call on them for advice and help." Minutes, p. 143.

Furthermore, it is clear that General Franklin was following his predecessors' policies in acting as he did.

Officers, employees and agents of the company were generally carried free of charge, often when they were travelling on company business and on occasions when they were not. In a very few instances, the grants were extended to include sons-in-law, daughters-in-law, granddaughters, nephews, nieces, and personal maids and nurses. In one instance, a governess was permitted to make one trip by herself, accompanied by a relative of her own. I should add at this point that all of the free and reduced rate passages granted during the period 1946–52 amounted to a very small fraction—about six one-hundredths of one per cent—of the number of passengers carried by the company during the period. The aggregate passages complained of amounted to 176 while the total number of passengers carried by the company in its transatlantic service for the period involved amounted to over 300,000. It should also be stated that most of these passages were granted on voyages of vessels which were not carrying a full complement of passengers, and it is at least arguable that the transportation that was granted was of minimal value. General Franklin testified:

"* * * I have on several occasions instructed the vice-president in charge of passenger traffic that the travel on our ships by officials of the company in many cases strictly on business was to be kept, insofar as possible, in the off-season—on-off season's voyages. By off-season voyages, I mean voyages that were not full." Minutes, p. 139.

A custom comparable to the one followed by the company here has been recognized and followed by interstate railroads and air lines and has been given Congressional recognition and approval. See 49 U.S.C. §§ 1(7), 22, 483(b), and 906(c), 49 U.S.C.A. §§ 1(7), 22, 483(b), 906(c).

And the custom followed by the company was similar to one recognized and followed by competitors operating in transatlantic passenger service. There is no question that the business conducted by the company was of a highly competitive nature, involving large scale advertising campaigns, the cultivation of public good will, and rather complex elements of public relations. I should add, too, that the president of the company and the board of directors cannot be said to have exceeded their legal powers either under the company's charter, its Amended Certificate of Organization of May 29, 1943, or the applicable deci-

sions of the State of New Jersey. See Madsen v. Burns Bros., 1931, 108 N.J.Eq. 275, 155 A. 28; Ellerman v. Chicago Junction Rys., 1891, 49 N.J.Eq. 217, 23 A. 287.

■■ We are dealing here with what is inherently a matter of discretion with regard to the conduct of a large and complex business in a highly competitive field and I do not believe that a court should interfere with the judgment of those legally charged with the operation of the business, in the absence of a clear showing that they have acted beyond their powers or otherwise improvidently. The plaintiff's contention rests, I think, upon the fallacious premise that any corporate asset not exchanged for a measurable *quid pro quo* is wasted. Under all of the circumstances presented by the record here, I cannot find that the policy followed in the granting of free and reduced passages was either illegal or abusively applied.

Judgment for the defendants.