## BALL v. BREED, ELLIOTT & HARRISON.*

(Circuit Court of Appeals, Second Circuit. November 5, 1923.)

No. 29.

1. **Equity ☞267—Amendments within discretion of court.**

   The allowance of amendments to pleadings is within the discretion of the court.

2. **Equity ☞267—Denial of amendment, after filing memorandum stating ground of dismissal, held not abuse of discretion.**

   Where complaint was verified May 1st, and motion to dismiss was served September 14th, and on September 29th court filed memorandum stating grounds of dismissal, *held,* that court did not abuse its discretion in denying plaintiff leave to amend on motion, notice of which was dated November 10th.

3. **Corporations ☞563(½)—Receiver has no cause of action that corporation did not have.**

   The right of receiver of corporation to recover secret promotion profits can be no greater than that of the corporation.

4. **Corporations ☞563(½)—Complaint by receiver to recover secret promotion profit held not to state cause of action.**

   Complaint by receiver of corporation to recover secret promotion profits did not state a cause of action, where it appeared agreement between promoters expressly stated, "The managers have received a profit by the sale of securities to the syndicate and will make no charge for their services as managers."

5. **Corporations ☞30(2)—Corporation not entitled to recover secret profits, where promoters owned all of stock.**

   If promoters themselves take the entire share capital of the corporation, and then sell the shares to outside parties, there is no fraud on the corporation, and no basis of complaint by it, no matter what secret profits the promoters may derive from the transaction.

Appeal from the District Court of the United States for the Southern District of New York.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 44 Sup. Ct. 333, 68 L. Ed. —.

Suit in equity by Wilbur L. Ball, receiver of the Haytian American Corporation, against Breed, Elliott & Harrison. From a decree dismissing the complaint, and an order denying its motion to amend the complaint, plaintiff appeals. Decree affirmed, and appeal from order denying motion for leave to amend dismissed.

Louis B. Wehle and J. Markham Marshall, both of New York City, for appellant.

Wise, Whitney & Parker, of New York City (Henry A. Wise and Cola G. Parker, both of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. On motion of defendant, the District Court dismissed the complaint. There was no other pleading and no testimony. The complaint was verified May 4, 1922, and the motion to dismiss was dated and served on September 14, 1922. On September 29, 1922, the District Court filed its memorandum opinion, stating the grounds of dismissal. Plaintiff served a notice of motion dated November 10, 1922, for leave to amend the complaint.

In support of this motion the solicitor for plaintiff filed his affidavit stating that the facts set forth in the proposed amendments were not fully known to counsel at the time of filing the bill, and that:

"Owing to the confused condition of some of the stock records of the corporation and the difficulty in obtaining an adequate understanding of them, counsel for the plaintiff first reliably learned of those facts early in the month of October, 1922."

The reasons given for delay were not satisfactory to the District Court, the trial judge observing:

"It is summarily stated that counsel has only recently become aware of the matters now alleged. This is far from being enough, where amendment is sought after decision going to the root of the suit."

Nevertheless, in a memorandum dated November 23, 1922, the court pointed out that the proposed amendments added nothing to the legal value of the complaint, and denied the motion for leave to amend.

[1, 2] The allowance of amendments to pleadings is within the discretion of the court, and in this case it is plain that there was no abuse of discretion. It is hardly necessary to cite authority for a proposition so thoroughly settled, and it will be sufficient, therefore, to refer to Tilton v. Cofield, 93 U. S. 163, 166, 23 L. Ed. 858, and Mexican Railway v. Pinkney, 149 U. S. 194, 201, 13 Sup. Ct. 859, 37 L. Ed. 699.

We shall not consider the proposed amendments, and shall look only to the bill of complaint; but, to avoid misunderstanding, we may observe in passing that we agree with the District Court that the proposed amendments would not have made any difference. Plaintiff is receiver of Haytian American Corporation, a New York corporation (hereinafter called H. A. Co.), appointed by the District Court for the Southern District of New York in a suit in equity to conserve the assets of the corporation.

The suit at bar was brought against this defendant, an Indiana corporation, and P. W. Chapman & Co., an Illinois corporation, to re-

cover an alleged secret profit stated to have been obtained in the promotion of H. A. Co. The defendant alone appeared. The complaint is lengthy, but we shall endeavor to condense it to its essential features. It is alleged that the facts are as set forth infra.

Before H. A. Co. was organized, there existed in Haiti four corporations—(1) a railroad company; (2) a wharf company; (3) an electric light company; and (4) a sugar company. In March, 1909, a New York corporation was organized called "The Central Railroad of Haiti," and this corporation in 1916 owned all the capital stock of the railroad and electric light companies, two-thirds of the capital stock of the wharf company, and large amounts of the obligations of each of these corporations. The aggregate of these securities par value was about $4,425,000. The Central Railroad, just prior to and at the time of the promotion and organization of H. A. Co. had outstanding securities and indebtedness to a considerable amount.

Prior to the organization of H. A. Co. "but as a part of the plan or scheme for its promotion and organization, and acting in concert with the defendant," one Tippenhauer (a) had by contract acquired an option, to purchase from Central Railroad of Haiti the stock, securities, and indebtedness of the railroad, wharf and electric light companies; and (b) had acquired the entire issued stock of the sugar company, and either in his name or that of the sugar company, had acquired options to purchase or lease sugar lands and contracts for the purchase of sugar cane.

Defendant and the Chapman concern (hereinafter called the bankers) agreed with Tippenhauer (1) that the properties and rights covered by the options and contracts should be transferred to H. A. Co., upon its organization, at a price of $1,100,000 in excess of the price at which Tippenhauer was willing to sell the properties and rights to H. A. Co.; and (2) that it should be made to appear that Tippenhauer was to receive from H. A. Co. the entire consideration to be paid by it in acquiring these properties and rights, whereas it was never intended that $1,100,000 of the consideration should be paid to Tippenhauer, and that this sum was secretly paid to the bankers. To carry out the scheme, the bankers entered into two agreements with Tippenhauer, each dated October 24, 1916. Under one agreement, H. A. Co. was to be organized with an authorized capitalization of $6,000,000 preferred stock, $12,000,000 common, and 60,000 shares no par value, to be known as "founders' shares."

Tippenhauer was to transfer to H. A. Co. his holdings and options. H. A. Co. (1) was to issue to Tippenhauer 60,000 shares each of its common and founders' stock, which, as ultimately formed was all of the stock of the corporation, and (2) was to pay Tippenhauer $1,600,000—i. e., $500,000 in cash at the time of the transfer of Tippenhauer's holdings, and the balance of $1,100,000 "as funds for that purpose should become available in the treasury of H. A. Co." For the purpose of providing H. A. Co. with the funds required for its business, the bankers were to have the exclusive right to purchase 55,000 shares of its preferred stock at par.

Under the second agreement of October 24, 1916, the bankers entered into a secret arrangement whereby, in consideration of "valuable services" rendered and expected to continue to be rendered to Tippenhauer in connection with the promotion and development of the enterprises and plans in question, it was agreed that the $1,100,000 should be paid to Tippenhauer at the rate of $20 for each share of stock sold, and irrespective of whether or not the stock sold would be paid for in full, provided that the sale had the approval of the board of directors. Tippenhauer was to transfer to the bankers, in connection with the purchase by them of preferred stock of H. A. Co., all his right to the sum of $1,100,000 after he received $500,000. The bankers were to be entitled to receive the $1,100,000, upon and in connection with the purchase by them of 55,000 shares of preferred stock of H. A. Co., and were to have the right to collect such amount in proportion to the amount of such preferred stock purchased, and at the time of the purchases. In case the bankers failed to purchase the preferred stock by March 30, 1917, they were to lose all right to such proportion of the $1,100,000 as would correspond to the preferred shares which then remained unpurchased, and Tippenhauer thereupon was to be revested with full right to such remaining balance of the $1,100,000.

The bankers, immediately after the execution of the two agreements of October 24, 1916, invited various individuals, firms, and corporations to become members and to participate in a syndicate, of which the bankers were to be syndicate managers, and to which the bankers in their individual capacities were to sell, if, when, and as issued, 55,000 shares of preferred stock of H. A. Co., 27,500 shares of common stock, and 27,500 of founders' stock, for a total price of $5,-225,000. The agreement under which the syndicate was to be formed was entitled "Syndicate Plan and Agreement," and a copy signed by the bankers is attached and made part of the complaint, but it does not contain the name of any subscriber. It was provided in the alleged syndicate agreement that the bankers, as individuals, would sell to the syndicate, if, when, and as issued to them, 55,000 shares of preferred and an aggregate of 55,000 shares of common and founders' stock for an aggregate sum of $5,225,000.

In January, 1917, H. A. Co. was organized, and on January 29, 1917, its incorporators duly elected a board of directors of 16 persons. Among those elected were Chapman, Tippenhauer, Elliott (then vice president of defendant), and the counsel of the bankers. On February 1, 1917, at a meeting of the board of directors, the bankers, as individuals, subscribed in their own names for 55,000 of preferred shares for cash at par, or $5,500,000, and H. A. Co. purchased from Tippenhauer the properties at approximately the previously agreed price, namely, $1,654,000.

The point of the foregoing allegations is that the bankers received a secret profit of $1,100,000, which they did not make known. The complaint concludes with various allegations as to consummation of the alleged fraud by entry on the books, and the assertion that "the corporation and the majority of the directors thereof remained in ignorance of the secret profit until the latter part of April, 1921."

As contended by defendant, the result of the alleged transactions was that all of the stock to be issued and all that was subscribed for was at this meeting of February 1, 1917, either subscribed for or owned by the bankers, or was agreed to be paid to Tippenhauer. The so-called secret profit was, as alleged in the bill, a matter of contract between these three, the two bankers and Tippenhauer, and the net result of the allegations of fact in the bill is that these same three parties, at the time of the transaction, and at the time of its consummation by the purchase of the properties by the corporation, owned all of the stock of the corporation.

[3] 1. Whatever right plaintiff has can be no greater than that of the corporation, and if the receiver has any cause of action it can be only that which the corporation itself would have. It is sought to bring the syndicate agreement in the case at bar within that found in Gates v. Megargel (C. C. A.) 266 Fed. 811. Without setting forth in detail the many provisions in the agreement in the Megargel Case and the agreement in the case at bar, it is sufficient to point to paragraph twelfth of the agreement in the present case. That paragraph provides:

"The managers have received a profit by the sale of securities to the syndicate and will make no charge for their services as managers."

[4] Thus there is a flat statement that the managers (which included this defendant) have received a profit by the sale of securities to the syndicate. In the Megargel Case, the agreement stated:

"We shall make no charge to the syndicate * * * other than reasonable commissions * * * being otherwise compensated in our purchases of said stock."

The effect of the Megargel decision was that the agreement in that case, construed as a whole, misled the syndicate participants. Reading paragraph twelfth in the case at bar with the remainder of the agreement, it cannot be fairly said that a similar deception was here practiced.

[5] 2. In the Megargel Case, and many other cases, the suit was brought by a subscriber or participant in the syndicate. In the case at bar, suit is brought by the receiver on the theory that the profit made by the promoters was without knowledge and consent of the corporation, and that the corporation does not consent, if any existing stockholder is ignorant of the transaction and of the so-called secret profit. The ultimate fact upon which decision must rest is that the alleged secret profit was a matter of contract between Tippenhauer and the bankers, and as these owned all the preferred and all of the common and all of the founders' stock which was either subscribed for or intended to be issued, there were no persons having any rights to receive stock from the corporation. Thus there were no innocent stockholders. In other words, there was no fraud upon the corporation. The law is very well summed up in Ehrich on Promoters, § 120:

"It is now established by an almost unbroken line of decisions that, if the promotors themselves take the entire share capital of the corporation and then sell the shares to outside parties, there is no fraud upon the corporation, and no basis of complaint by it, no matter what profits the promoters may derive from the transaction. There is, it is said, no fraud upon the corpora-

tion, nor upon any one in the original transaction; for there is in effect a mere change of form, the promoters receiving the share certificates in the place of the property transferred to the corporation, and the value of the property transferred to the company is the exact measure of the value of the shares received in payment therefor. The par value of the shares issued in payment may greatly exceed the value of the property transferred to the corporation, but the amount by which the property transferred falls short of the par value of the shares will be exactly represented by the difference between the par and the actual value of the stock. If there is any fraud in a subsequent sale of the shares, the cause of action arising therefrom is personal to the purchasers. The matter is one between these purchasers and their vendor, and no cause of action results to the corporation therefrom."

In the briefs, very many cases are cited, an analysis of which will not be profitable, for the reason that this case falls within the principle of Old Dominion Copper Co. v. Lewisohn, 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025, and its companion cases in 195 Fed. 637, affirmed 202 Fed. 178, 120 C. C. A. 392, certiorari denied 229 U. S. 613, 33 Sup. Ct. 772, 57 L. Ed. 1352. In Davis v. Las Ovas, 227 U. S. 80, 33 Sup. Ct. 197, 57 L. Ed. 426, the court held that, where the true consideration of a syndicate purchase is concealed, and the property is conveyed at a higher figure in shares of stock to a corporation whose stock is held partly by members of the syndicate and partly by others, and the necessary increase of shares to pay for the property goes to some of the syndicate promoters as a secret profit, the corporation may maintain an action to require those obtaining the shares to surrender them for cancellation.

Mr. Justice Lurton made clear the distinction between the facts in the case just referred to and the Old Dominion Copper Co. Case, supra; for in the Las Ovas Co. Case, supra, there were innocent members of the syndicate, who became stock subscribers and directors of the company. Mr. Justice Lurton pointed out:

"The distinction between a case in which all of the owners of the property and all of the members of the buying corporation are the same persons, and participate in the profit realized, and the case here presented is fully recognized in Old Dominion Copper Company v. Lewisohn, supra, as well as in Phosphate Company v. Erlanger, 5 Ch. Div. 73, and in the well-considered opinion of Judge Severens in Yeiser v. U. S. Paper Co., 107 Fed. 340."

In the case at bar, there is no such state of facts. It is nowhere alleged as a fact, nor can it be inferred, that there were any innocent stockholders at the time of the transaction complained of. If, then, there was a fraud, it was not against the corporation, and a cause of action, if any, is personal to the purchasers of the stock. The fraud, if any, is what has been called a subsidiary fraud not affecting the corporation. Allowing to the complaint the most favorable inference, all that can be said is, as concisely stated by the District Court, that:

"These transactions between the defendants and the subscribers to their syndicate had nothing to do with the formation of the corporation, the syndicate subscribers only agreed with the syndicate managers to take what the managers get for them, and they got it through the managers."

Appellant puts forward the theory that, because of the dealings with the syndicate and the dealings of the members of the syndicate with the public prior to incorporation, therefore both the public and

the syndicate members were equitable stockholders at the time of the transactions complained of. This theory is characterized by ingenuity rather than by substance, and in our view does not invite discussion.

In view of the conclusions stated, supra, we deem it unnecessary to discuss some other points which have been raised by the parties.

Decree affirmed, with costs, and appeal from order denying motion for leave to amend dismissed.