## SOUTH PENN COLLIERIES CO. v. SPROUL et al.

### No. 4550.

Circuit Court of Appeals, Third Circuit.

Sept. 25, 1931.

558

Dickson, Beitler & McCouch, of Philadelphia, Pa. (Chas. J. Biddle, Thos. Reath, Jr., and Philip Wallis, all of Philadelphia, Pa., of counsel), for appellant.

Robt. T. McCracken, Lucien B. Carpenter, and E. Clinton Rhoads, all of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This was a suit in equity by the receiver of the South Penn Collieries Company, hereinafter called the South Penn Company, to recover from the defendants, administrators of the estate of William C. Sproul, deceased, and Newton P. Jackson, over a million dollars, and for a further accounting. Sproul and Jackson were the promoters of the South Penn Company. The claim was based upon (a) the receipt of alleged secret profits by the promoters and (b) upon the alleged negligent payment of certain debts of the Kresge Coal Company out of the funds of the South Penn Company by them as officers and directors of that company. The District Court dismissed the complaint on the ground that neither fraud nor negligence had been shown, and the plaintiff appealed to this court.

The appellant does not dispute the findings of fact which are based on substantial evidence. He says that the court reached an erroneous conclusion from undisputed facts. It is necessary, therefore, to summarize the facts and consider the conclusion.

From the facts found by the court, it appears that:

In June, 1924, the Kresge Coal Company was known to be insolvent by a wide margin by all those who participated in its management. The company's liabilities were in excess of $550,000. Its assets consisted of a few culm banks, equipment, and the lease of a certain coal mining property. The culm banks were unprofitable except during serious coal shortages, and as a consequence the condition of the Kresge Company was becoming increasingly hopeless.

William C. Sproul and the several other stockholders who owned the 5,000 shares of capital stock concluded that the company could be saved if new capital should be provided to enable it to acquire additional coal properties so as to keep it profitably in the coal business during the periods when the culm banks could not be worked. The plan designed to achieve the purpose was to form a new corporation to take over the properties of the Kresge Company and acquire others. Sproul and Jackson undertook to promote the new company, known as the South Penn Collieries Company. As a part of the plan, the stock of the Kresge Company was to be exchanged share for share for the common stock of the South Penn Company.

In addition to owning 1,200 shares of the capital stock of the Kresge Company, Sproul

was the owner of bonds of the company to the extent of $183,000 out of the $300,000 outstanding.

Shortly after July 1, 1924, the stockholders of the Kresge Company turned their certificates of stock over to Sproul to be exchanged for stock of the South Penn Company, which had then come into existence. The offer of exchange of stock was accepted in August, but the certificates were not actually issued until February, 1925.

On August 4, 1924, the board of directors of the South Penn Company bought the first of the coal properties which it had been organized to acquire. This was the "Katherine Property," for which Sproul and Jackson paid the owners $384,000 and which they resold to the South Penn Company for $700,000, thus making a net profit of $316,000.

On November 7, 1924, the South Penn Company bought all of the stock of the Randolph Coal Company and the Middleport Coal property from Sproul and Jackson for $825,000 in cash and 50,000 shares of the common stock of the South Penn Company. This consideration, however, included payment to the promoters, who apparently controlled the board of directors, for their services in connection with the purchase of two other properties by the South Penn Company. The promoters realized from these transactions an apparent profit of $533,666.67, without considering the 50,000 shares of the South Penn Company, for they paid only $291,333.33 for the Randolph and Middleport properties.

The lower court expressly found that in purchasing the above properties from the promoters there had been a full and fair disclosure of the profits to be realized by them to all of the stockholders of the Kresge Company, who, excepting Sproul and Jackson, were the only stockholders of the South Penn Company.

On November 13, 1924, the capital stock of the South Penn Company was increased by the authorization of an issue of $4,000,000 8 per cent. cumulative preferred stock. This resulted from a plan to finance completely the South Penn Company. Sproul and Jackson obligated themselves to take the entire issue of the preferred stock at par upon the following conditions: That they would turn in the Randolph and Middleport properties at a price giving them a profit in excess of $400,000; that the South Penn Company would allow them to credit $400,000 of the purchase price of these properties against their obligation to pay par value of $4,000,-

000 for the entire issue; and that they would in turn sell the stock to the public or take it themselves at 90 per cent. of the par value.

They interested various persons in this preferred stock and sold a block of it to B. Dawson Coleman, John P. Crozer, and T. Coleman Du Pont. Their stock was thus secured as purchasers from Sproul and Jackson and not as original subscribers. At the time of purchasing the stock, Crozer and Du Pont were advised as to the methods by which the profits of the promoters were to be used to make the stock fully paid. Coleman was apparently under the impression that he was merely making a loan, but it is found "that in reality the transaction was as has been found above."

On November 7, 1924, while the board of directors was still under the control of the promoters, payments amounting to $405,422.77 were authorized for the benefit of the creditors of the Kresge Company. This was paid out in different amounts over the period from August 8, 1924, to March 17, 1925.

The court below expressly found that Sproul and Jackson acted in good faith and without negligence in authorizing the payment of the various obligations of the Kresge Company by the South Penn Company.

An independent board of directors was elected, and it determined after April 1, 1925, to spend no more money in attempting to keep the Kresge Company going. Thereafter the Kresge stock was returned by the South Penn Company to its original owners. The Kresge Company subsequently went into bankruptcy and its assets were sold for $600. Its bonds and notes, amounting to $400,000, which the South Penn Company acquired and held, are entirely worthless.

Final payment was made to Sproul and Jackson on March 13, 1925, for the Katherine, Randolph, and Middleport properties, at which time the promoters, by agreement with the company, remitted $190,000 of the balance due.

The first question raised on this appeal, as above stated, relates to alleged "secret profits" made by the promoters of the South Penn Company by means of the purchase of coal properties and the resale of them to the company at an advanced price. These involve the Katherine, the Randolph, and the Middleport properties.

The question of secret profits has caused endless discussion in the courts, text-books, and legal periodicals, and the only safe statement that can be made is that hardly any two authorities have been in absolute accord. The

560

term "promoters" has a suspicious sound, and the courts have gone far to protect a careless public. This duty, however, in reality belongs to the Legislature, for it is difficult to find in existing legal rules the authority to curb the originators of the corporation because it is a comparatively modern device.

The promoter is a fiduciary. But how far his relation as such to a proposed or newly created corporation goes, is difficult to answer. In the present case the appellant asserts that the promoters of the South Penn Company admittedly received and retained large profits without disclosure to those entitled to know. The parties here rely on two cases; the appellant on Davis v. Las Ovas, 227 U. S. 80, 33 S. Ct. 197, 57 L. Ed. 426, and the appellees on Old Dominion Copper Company v. Lewisohn, 210 U. S. 206, 28 S. Ct. 634, 52 L. Ed. 1025. There is really no inconsistency between them. They reach opposite conclusions because the facts on which they are based differ. The problem to solve here is as to which one controls the case at bar, for admittedly the one or the other does. If the South Penn Company has been injured by the promoters it has the right to redress, if that right can be brought within the principles announced in the case of Davis v. Las Ovas, supra. The appellant relying upon that case says that he is in the position of the injured corporation, and should prevail because of the fact that Coleman, Crozer, Du Pont, and the Kresge stockholders were "innocent and deceived members" of the corporation when the properties were taken over by it.

If the promoters made secret profits based on fraud and failed to disclose them to the stockholders of the South Penn Company or to original subscribers, the decree should be reversed. If, on the other hand, there was no fraud, no failure to disclose profits to proper parties, this case falls within the principles announced in the Old Dominion Case, and in the absence of negligence in paying the obligations of the Kresge Company, the decree should be affirmed.

The appellant says that since Coleman, Crozer, and Du Pont gave Sproul large sums of money for some purpose, they must, at least, be considered equitable owners of preferred stock on November 7, 1924. But this is untenable for, while the evidence is not quite clear as to what their exact relation to the South Penn Company at that time was, it is clear that they were not stockholders nor original subscribers but derived their title through Sproul and Jackson, and so the corporation could not acquire a right legal or equitable through them. Ball v. Breed, Elliott & Harrison (C. C. A.) 294 F. 227.

Neither could it acquire a right through them or others as future subscribers. In the courts of the United States, at least, the fiduciary relation of the promoter to a corporation does not extend down to future stockholders, to the time of later subscriptions which the promoters planned to obtain. The promoter is under no obligation to disclose to any one except those who were members of the corporation at the time of the transaction when profits were made. Old Dominion Copper Company v. Lewisohn, supra.

That leaves only the Kresge stockholders for consideration. All of these knew of the hopeless financial condition of the company, and that while they believed its properties might prove to be valuable, it would be forced to cease operating unless drastic steps were taken to save it under their plan of acquiring new properties and refinancing through the South Penn Company. Sproul was asked to save the company by the plan which was known to all and had been worked out in conferences. He agreed to attempt the reorganization with Jackson if they were allowed to make profits out of the sale of certain coal properties to the South Penn Company. Sproul had a large amount of money invested in the Kresge Company and his services were indispensable to the plan of refinancing it. He took all the risk, personally put in all the money not obtained from the outside, and completely dominated the situation. On the other hand, the stockholders of the company exchanged their unmarketable stock for the stock of the newly financed South Penn Company. The Kresge Company gave the promoters of the South Penn Company full power to do as they believed best in order to save it. They were told that they might make profits and all the stockholders, save possibly in two negligible exceptions, knew it. This is certainly not the ordinary case where the promoters of a new corporation stealthily and intentionally set out to deceive and defraud an unsuspecting public.

In the Lewisohn Case, the promoters formed a corporation for the purpose of selling certain property to it at a profit. They formed a syndicate to carry out their plan, with the agreement that the money subscribed by the members of the syndicate should be used for the purchase and sale of this property to the new corporation, and

that the members should receive in proportion to their subscriptions the profit made by the sale. With the subscription money, the promoters purchased the mining property and real estate of another corporation. The mining property of the syndicate was sold at a large profit to the corporation. The real estate was also sold by the promoters at a profit. The members of the syndicate and the promoters owned all the stock issued at the time of the sales, but the sale of a large issue to the public was contemplated and in fact such sale was made. The real estate sold by the promoters was purchased by them at a far smaller price than the corporation paid for it. The court said that the syndicate was a party to the scheme to make a profit out of the corporation, and that whether or not there was a subordinate fraud committed by the promoters was immaterial, for all the existing members assented to the transactions with full knowledge of the facts.

In the present case, the stockholders of the Kresge Company agreed to exchange their stock for the stock in the South Penn Company. Their idea and that of the promoters was to save the Kresge Company. They exchanged worthless stock share for share in a new company which they believed was going to be valuable. They intended to profit at the expense of the new company. They were the only members of the new company at the time of the sales in question, were fully informed of the situation, and knew that the promoters expected to derive a profit through the sales. Even if this profit of the promoters is called a subordinate fraud, it would be immaterial under the doctrine of the Lewisohn Case, for all who were members at that time knew it and assented to it, and the receiver cannot acquire a right through future innocent stockholders.

This case is stronger than the Lewisohn Case inasmuch as there was the utmost good faith on the part of the promoters and not even a suggestion of fraud.

■ Assuming, however, that the promoters were under an obligation to disclose the profits to the existing members of the South Penn Company, the evidence shows that they had notice with the exception of two who had received their stock in exchange for the worthless Kresge stock. It is true that the notice which the court held sufficient does not reveal the exact amount of the profits that the promoters made. But, as the trial court said, the association of the stockholders of the Kresge Company with Sproul and Jackson must be kept in mind. The plan

to form a new company and to sell new property as well as that of the Kresge Company to it was carried out after much deliberation. Sproul and Jackson were given free rein in the hope that they might be able to give to the worthless stock some value. Under these circumstances, the promoters' obligation did not require a complete and detailed explanation of the profits. We are aware, however, that many state courts under entirely different circumstances have held that a disclosure which on further investigation will reveal the profits made is not sufficient. But such is not the case at bar. Nebraska Mausoleum Company v. Matters, 108 Neb. 618, 626, 627, 188 N. W. 231; Arnold v. Searing, 78 N. J. Eq. 146, 160, 78 A. 762. Contra, Brooker v. William H. Thompson Trust Company, 254 Mo. 125, 160–161, 162 S. W. 187. The facts of this case bring it within the principles of the Lewisohn Case and not those of the Las Ovas Case, for in that case a profit was made by means of a fraud practiced by the promoters upon the other members of the syndicate and corporation.

The second question in this case is that Sproul and Jackson, as officers and directors of the South Penn Company, were negligent in expending large sums of money in payment of the Kresge Company's debts.

The appellant has misconstrued the opinion of the District Court on the question of negligence. He states that the District Court made its primary error in considering this claim as one necessarily founded on fraud or bad faith and not alone on negligence, but he is mistaken, for the court did fully consider the question of negligence and held that the appellant was not entitled to prevail on that ground.

■■ Unquestionably, the directors and officers of a corporation must use due care and are liable for their negligence in conducting the affairs of the corporation; but what constitutes negligence varies with the circumstances of each case. What is negligence in one case, may not be in another. The Supreme Court stated the general rule in Briggs v. Spaulding, 141 U. S. 132, 152, 11 S. Ct. 924, 931, 35 L. Ed. 662, as follows: "In any view the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of

negligence is therefore ultimately a question of fact, to be determined under all the circumstances."

 This case, as it turned out, may seem shocking in waste, but it must be considered as it really appeared at the time to the promoters and stockholders who were honestly doing their best to make an insolvent corporation succeed. Negligence cannot be constructed out of the failure to use unerring judgment nor out of sympathy for the plight of unfortunate creditors and investors. The promoters acted in good faith and exercised that degree of care which ordinarily prudent men would exercise under similar circumstances. No more is required.

We do not find that the District Court erred, and the decree dismissing the bill of complaint is affirmed.