**Isadore H. BELLIS and Ralph W. Pitman, Trustees for Commonwealth Financial Corporation, et al.**

v.

**Morise THAL and Albert B. Gerber.**

**Civ. A. No. 69–2843.**

United States District Court, E. D. Pennsylvania.

March 12, 1974.

122

Leon S. Forman, Philadelphia, Pa., for plaintiffs.

Morise Thal and Albert B. Gerber, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GORBEY, District Judge.

Plaintiffs are trustees in the consolidated reorganization proceedings of Commonwealth Financial Corporation (Commonwealth), Neighborhood Finance Co. Inc., Neighborhood Finance Co. Inc. of Pennsylvania, and Quaker City Investment Corporation (Quaker) under Chapter X of the Bankruptcy Act pending in this district, Cause No. 30108. The defendants, officers, directors and dominant shareholders are charged with breach of fiduciary duty, mismanagement, diversion of assets and self-dealing, involving Commonwealth, its subsidiaries and other companies which the defendants dominated and controlled. The case was tried before this court without a jury.

Before making our factual findings, a brief discussion of the applicable legal standards appears in order. Defendants have admitted their fiduciary relationship as officers and directors of Commonwealth and its subsidiary corporations. Plaintiffs' claims fall into three categories. The first category concerns specific transactions in which it is alleged that the defendants engaged in self-dealing in the performance of their functions as corporate fiduciaries. The second concerns specific transactions where there is no self-dealing, but is alleged that there was a breach of duty, waste, mismanagement and negligence. The third is a general claim for the shrinkage of assets of the corporation allegedly due to the defendants' breach of duty, waste, mismanagement and negligence.

In the first category, plaintiffs allege that defendants caused Commonwealth to engage in certain transactions with other corporations or organizations which the defendants dominated and

controlled, or in which the defendants had an interest either as an officer, director or stockholder. In cases where the dealings of a fiduciary with the corporation are challenged, the burden of proof is upon the fiduciary to demonstrate his good faith and the fairness involving the transaction complained of. In Pepper v. Litton, 308 U.S. 295, 60 S. Ct. 238, 84 L.Ed. 281 (1939), the Supreme Court stated the fundamental rule as follows:

> "A director is a fiduciary . . . So is a dominant or controlling stockholder or group of stockholders . . . Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. (Citations omitted) The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders."

Thus, when a transaction which is not a completely arm's length transaction is challenged, the burden is on the fiduciary to prove the fairness of the transaction. *See also* Pappas v. Moss, 393 F. 2d 865 (3d Cir. 1968); Kohn v. American Metal Climax, Inc., 322 F.Supp. 1331 (E.D.Pa.1971), modified in part, 458 F. 2d 255 (3d Cir. 1972); Hirshhorn v. Mine Safety Appliances Co., et al., 106 F.Supp. 594 (W.D.Pa.1952).

■■ The second category of claims by the plaintiffs concerns transactions for which plaintiffs claim defendants breached their fiduciary duty, but in which there was no showing that the defendants had an adverse interest or that the transaction was not at arm's length. Directors and officers of a corporation may be held liable for any loss resulting from a failure to use reasonable and ordinary care, skill and diligence in conducting the business of the corporation. *See generally* Hunt v. Aufderheide et al., 330 Pa. 362, 199 A. 345 (1938). In describing the duty of care owed by directors in managing corporate affairs, the courts have generally adopted one of two rules. The first of these, and probably the majority rule, is that of the reasonable director (*i. e.,* that care which a reasonably prudent director of a similar corporation would have used under the circumstances). *See* Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891). Other jurisdictions, including Pennsylvania, have adopted a standard that a director shall discharge his duty with "that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their *personal business affairs*".[1] (Emphasis added)

■ This "personal affairs rule" imposes a higher duty of care on corporate fiduciaries than the common law. The Supreme Court of Pennsylvania recently discussed this rule in the case of Selheimer v. Manganese Corporation of America, 423 Pa. 563, 224 A.2d 634 (1966). In this case the court held that in the absence of fraud, self-dealing, or proof of personal profit, or wanton acts of omission and commission, the directors of a business corporation who had been imprudent, wasteful, careless and negligent may be held personally liable under the common law or § 408, where such actions have resulted in corporate losses

---

1. § 408, Article IV of the Pennsylvania Business Corporation Law of 1933, 15 P.S. § 2852–408.

resulting in the insolvency of the corporation.

■ However, a claim of this nature differs from one where there has been self-dealing by the fiduciary in that the burden does not shift to the fiduciary where there is no showing that the transaction was not at arm's length. Thus, the plaintiffs must show that the defendants breached their duty and that the conduct complained of was not fair or in the interest of the corporation. What constitutes negligence or breach of duty depends upon the circumstances of the particular case. Selheimer v. Manganese Corporation of America, *supra*. *See also* South Penn Collieries Co. v. Sproul, 52 F.2d 557 (3d Cir. 1931); Otis & Co. v. Pennsylvania R. Co., 61 F. Supp. 905 (E.D.Pa.1945), aff'd, 3 Cir., 155 F.2d 522. The burden does not shift to the defendants to prove the fairness of the transaction. Uccello v. Gold'n Foods Inc., 325 Mass. 314 (1950), 90 N.E.2d 530, 16 A.L.R.2d 459.

■ Plaintiffs would have us apply a different standard. They appear to urge that once self-dealing by the fiduciary has been shown in one transaction, the burden shifts to the fiduciary to show the fairness of all transactions complained of—whether or not there has been any evidence that such transaction was not at arm's length. This we will not do. The fact that a transaction was not at arm's length does not make it illegal. Evans v. Armour & Co., 241 F. Supp. 705 (E.D.Pa.1965). It merely shifts the burden of proof.

■ Such a holding would impose upon corporate fiduciaries a higher burden than the law requires and would expose corporate fiduciaries to liability many times in excess of the damage their own actions may have caused. This would effectively make the corporate fiduciary an insurer of corporate profits. This the courts have consistently refused to do. Selheimer v. Manganese Corporation of America, *supra*.

■ In addition to claiming for specific transactions, plaintiffs also claim that because of their breach of duty, negligence, mismanagement and waste, the defendants are liable for the total shrinkage in assets of Commonwealth. The standard for the defendants' duty of care will be the same as that discussed for specific transactions. However, there is an additional problem which the Pennsylvania Supreme Court in the Selheimer case discussed. Before the defendants may be held liable for damage to the corporation as a result of their breach of duty, the plaintiffs must show that such breach of duty was the proximate cause of the injury to the corporation. In the Selheimer case, the trial court had awarded to the corporation the total amount of the shrinkage in assets of the corporation over the two-year life of the corporation. The Pennsylvania Supreme Court, in affirming liability, reversed and remanded on the issue of amount of the damage, stating at 224 A.2d at page 646:

"In adopting this measure of damages —tantamount to attributing all *Manganese's* losses to defendants' conduct —we believe the chancellor erred. The duty of reimbursement should be limited to those losses which were proximately caused by the negligent and wasteful conduct of defendants . . . the nexus between *Manganese's* losses and defendants' negligent and wasteful actions must act as the basis for reimbursement."

Thus, before any such award for damages will be granted, plaintiffs must show that the defendants' breach of duty proximately caused the damage to the corporation.

## LIABILITY—JOINT AND SEVERAL

■ Where one fiduciary either approves, acquiesces in, or conceals the breach of duty by another fiduciary, they are both jointly and severally liable. Higgins v. Shenango Pottery Co., 279 F.2d 46 (3d Cir. 1960); Seaboard Industries, Inc. v. Monaco, 442 Pa. 256 (1971), 276 A.2d 305.

In the case at bar, the record is replete with evidence that the defendants

Thal and Gerber acted in concert and were the principal parties directing the affairs of Commonwealth.[2] We also find that as to the specific transactions in question in this case, the defendants actively participated in both the execution of the transactions and the concealment of the essential nature of these transactions.[3] Accordingly, we hold that the defendants are jointly and severally liable for any actions upon which we hold that they are liable.

With these principles in mind, we will begin to wade through the quagmire which has been left to this court to unscramble. In this endeavor, we will deal with each set of related transactions separately and in the following order:

(1) specific transactions alleging lack of an arm's length bargain;

(2) specific transactions alleging breach of duty by the defendants;

(3) a general claim for breach of duty, waste, mismanagement and negligence.

## TRANSACTIONS ALLEGING LACK OF ARM'S LENGTH BARGAIN

### ENCYCLOPEDIA PAPER

Between August 30, 1966 and December 2, 1966, the defendants caused Commonwealth to advance to Bonded Credit Bureau, Inc. the sum of $300,000 in the form of loans.[4] By the defendants' own admissions, they controlled and dominated Bonded Credit Bureau, Inc.[5] On January 16, 1967, Commonwealth purchased from Bonded Credit certain accounts receivable, arising from the sale of World Scope Encyclopedia sets. The total price for this sale was $320,000. Payment was made in the form of cancella-

tion of the $300,000 debt from the prior loan to Bonded, plus $20,000 in cash, which was paid on March 16, 1967. Shortly before this sale, Bonded Credit had purchased these accounts receivable at a total cost of $50,000. This was in the form of $40,000 to James Talcott, Inc.; $5,000 to World Scope Publishers, Inc., for the paper itself; plus a $5,000 finder's fee to Irving Canter. Irving Canter was the president and only stockholder of Bonded Credit. He also worked with Thal and Gerber to arrange the deal.[6]

In this transaction there is no direct link between the defendants and Bonded Credit, in that they were neither officers, directors or shareholders of Bonded Credit. Plaintiffs rely on the fact that defendants admit that they dominated and controlled the affairs of Bonded Credit. Plaintiffs argue that this domination and control is sufficient to destroy the trappings of an arm's length bargain and thus, shifts the burden to the defendants to prove the fairness of the transaction. Domination and control may not, in every case, shift the burden. The term is not clearly defined. The court can envision transactions where there may be domination and control but no self-dealing.[7]

However, under all the circumstances of this transaction and this case, we hold that the burden is on the defendants to prove its fairness to Commonwealth. Defendants' domination and control of Bonded Credit was not that obtainable through Commonwealth, for Commonwealth had no interest in Bonded Credit. The defendant Thal admits he was in charge of reviewing all bank statements of Bonded, despite the fact that Irving Canter was the president

2. *e. g.* Pretrial Order (P.T.O.) ¶ V. 5; N. T. pp. 1–54, 1–55.

3. *e. g.* N.T. pp. 1–52, 1–55.

4. Basic facts of this transaction were stipulated to by parties. P.T.O. ¶ V. 8.

5. P.T.O. ¶ V. 5 and N.T. p. 1–89.

6. N.T. p. 1–90.

7. *i. e.*, Transactions between parent and wholly owned subsidiaries where the officers of the parent, who have no independent interest in the subsidiary, through their control of the parent can dominate and control the subsidiary.

and sole stockholder of Bonded.[8] In addition, taking into account the entire context of this case, the actions of the defendants are highly suspect.

In attempting to explain this transaction, the defendants state that Bonded Credit was merely a "conduit" for Commonwealth. They claim that any money paid to Bonded Credit was solely for the benefit of Commonwealth, and that they never received any money personally from Bonded Credit.[9] To support this they state that all monies paid to Bonded were then paid out from Bonded to Mutual Bond and Mortgage Company, and that such payment inured to the benefit of Commonwealth.[10] Defendants have no evidence to prove this other than their own statements.[11] In addition, defendants admit that they also controlled and dominated Mutual Bond.[12] The records of Bonded Credit and Mutual Bond were never produced by defendants to support their claim.

As a result of this transaction, Commonwealth paid $320,000 for accounts receivable which were worth approximately $45,000.[13] Since defendants have made no satisfactory explanation of this transaction, as is their burden, we find they are liable as a result thereof for the sum of $275,000.

## STATE FINANCE COMPANY

Defendants, by their own admission, controlled and dominated the affairs of State Finance Company.[14] In the early 1960's, State Finance Company was in serious financial trouble. It owed a considerable amount of money to New York financing institutions; it was insolvent.[15] The defendants, using their own funds, purchased the stock of State Finance in their own name for under $10,000.[16] Defendants claim that they took title as trustees, and not in their own right;[17] however, there is no evidence to that effect.[18] The records show that the company was owned by the defendants.[19] Defendants claim that this was to insulate Commonwealth from potential liability as a result of a pending suit by several banks.[20] From the period 1962 to 1967, defendants caused Commonwealth to advance large sums of money to State Finance.[21] On August 17, 1966, the defendants sold State Finance Company to Saul Kopieka.[22] However, defendant Gerber admits that Kopieka was a friend of his, and that Commonwealth continued to operate State Finance Company in the same manner it had done since the defendants purchased State Finance in 1962.[23] On May 31, 1968, State Finance closed its doors and went out of business.[24] At

---

8. N.T. pp. 3–10, 11

9. N.T. pp. 2–114, 115.

10. N.T. p. 2–116.

11. Here, as throughout this opinion, the unsupported and self-serving testimony of the defendants has been rejected. Defendant Thal plead guilty to a criminal charge of securities fraud concerning the offer and sales of securities of Commonwealth. (N.T., p. 3–76.)

12. P.T.O. ¶ V. 5.

13. This is excluding the $5,000 finder's fee to Irving Canter. Defendants never justified the amount of that fee. Canter received other compensation for his duties with respect to Bonded (N.T. p. 1–90). Further evidence that the paper was only worth approximately $45,000, is the fact that total estimated collections on this paper amounted to slightly more than $50,000 over a six-year period.

14. P.T.O. ¶ V. 5.

15. N.T. pp. 3–12, 3–57.

16. N.T. pp. 2–24.

17. N.T. p. 3–13.

18. The Minutes of the Board of Directors of Commonwealth show that defendants were authorized to purchase the stock as trustees but there is no evidence that this is what occurred. In fact, defendants admit they used their own funds to purchase the stock.

19. N.T. p. 2–24.

20. N.T. p. 2–124.

21. N.T. pp. 3–58, 59.

22. N.T. p. 2–24.

23. N.T. p. 1–46.

24. P.T.O. ¶ V. 9.

that time, the outstanding balance on the loans from Commonwealth, including accrued interest, stood at $100,599.02.[25]

Thus, it appears that State Finance, owned by the defendants, was operated for them by Commonwealth. The defendants caused Commonwealth to advance large sums of money to State Finance. These were clearly not arm's length transactions. Thus, it is the defendants' burden to prove their fairness to Commonwealth.

Defendants maintain that there was no loss to Commonwealth as a result of this transaction. They claim to have purchased State Finance because it had a small loan license which was difficult to obtain, and it had a going business value. In addition, they maintained that because the interest rates that State Finance paid to Commonwealth on the loans were greater than the rates that Commonwealth paid to banks from which it borrowed the money, the deals were profitable to Commonwealth.[26]

However, in this transaction, as in all the others, defendants' justification of the transaction is completely unsupported by corroborating evidence. They did not produce any records of State Finance or even attempt to demonstrate with calculations the effect of the purported difference in interest rates. Again, the defendants have failed to meet their burden of proving the fairness of the transaction. As a result of these advances to State Finance Company, the defendants are liable for the sum of $100,599.02.

## LEE BLAKE FORD AGENCY, INC. and ROBERT REESE

Defendants, by their own admissions, controlled and dominated the affairs of Lee Blake Ford during the entire period in question.[27] According to the defend-

ants, Lee Blake Ford Agency, Inc. was acquired by Commonwealth in the early 1960's through the purchase of several finance companies to which Lee Blake was indebted, and for which the stock of Lee Blake was pledged as security.[28] On July 10, 1963, Commonwealth sold the stock of Lee Blake Ford to Robert Reese for the sum of $15,250, plus interest. However, cash payment of that sum was not made and the sale was recorded on the books of Commonwealth as a loan to Robert Reese.[29] Robert Reese, according to defendants, was brought in by them at that time to manage Lee Blake Ford.[30]

On the date the reorganization petition was filed, the debt owing to Commonwealth from Robert Reese stood in the amount of $16,542, and is uncollectable.[31] In addition, during the period from 1963 to 1967, defendants caused Commonwealth to advance large sums of money to Lee Blake. At the time of the reorganization, the outstanding indebtedness by Lee Blake owed to Commonwealth (through a subsidiary, Quaker) amounted to $60,085. Lee Blake is currently out of business, and this amount is uncollectable.[32]

As with the Encyclopedia Paper, plaintiffs argue in this case that defendants' domination and control of the affairs of Lee Blake Ford is sufficient to shift the burden to the defendants to prove the fairness of these transactions. In the sale of stock and loan to Robert Reese, there is no showing of any interest or control by the defendants over Robert Reese. Defendants claim that they brought in Reese to manage Lee Blake Ford. We do not feel that this is a sufficient showing that the deal with Robert Reese was not at arm's length. Accordingly, the burden is on the plaintiffs to show the defendants' breach of duty. Since plaintiffs have put forth no

25. N.T. p. 2–84.
26. N.T. p. 2–126.
27. P.T.O. ¶ V. 5.
28. N.T. p. 2–127.
29. N.T. pp. 2–28, 2–56.
30. N.T. p. 2–129.
31. N.T. p. 2–29.
32. N.T. p. 2–30.

evidence with respect to the impropriety of this transaction, we hold that the defendants are not liable as a result thereof.

However, in the transaction concerning the advances to Lee Blake Ford, we have a different situation. Here, the defendants admit that they dominated and controlled the affairs of Lee Blake Ford. This control could not have been through Commonwealth since Commonwealth had already divested itself of the stock of Lee Blake Ford. Defendants' control over Lee Blake Ford was more than that of Commonwealth's and could have been exercised contrary to the interests of Commonwealth. Accordingly, we hold that under the circumstances of this transaction, it does not appear to be an arm's length bargain. Thus, the burden is on the defendants to prove the fairness of the transaction.

Defendants' only explanation is that they lent the money to Lee Blake in order to allow it to enter into the auto leasing business,[33] but they put forth no corroborating evidence to support this, or to show the loan was proper and in the best interest of Commonwealth. Defendants have not met their burden. Accordingly we hold that as a result of the transactions with Lee Blake Ford, the defendants are liable in the amount of $60,085.

## MADISON AGENCY, INC.

Defendants Thal and Gerber were president and secretary, respectively, of Madison Agency.[34] In addition, Gerber was a stockholder in Madison Agency.[35]

Defendants resigned their positions as officers of Madison on April 29, 1966.[36] However, this fact does not appear to have changed the basic relationship between the defendants and Madison. Gerber continued as a stockholder and admitted that he had, in fact, although not legal, control of Madison Agency.[37] In the period 1962 to 1967, Commonwealth made substantial loans to Madison. As of August 31, 1967, Madison owed Commonwealth an outstanding balance of over $78,000.[38] On August 31, 1967,[39] defendants caused Commonwealth to cancel $53,261 of this indebtedness in return for a redemption of capital notes and debentures of Commonwealth that had been held by Madison.[40] However, these debentures and notes were not due for several years.[41] At that time, defendants knew that Commonwealth was experiencing substantial financial difficulties.[42] Several months prior to that date their auditors had refused to issue an unqualified opinion of their financial statements. Their banks had begun cutting off their credit.[43] On May 17, 1967, Commonwealth had advised its stockholders of the reduced availability of funds.[44] From the surrounding circumstances, it is obvious that defendants were well aware of the financial plight of Commonwealth as of that date. The net result was that a company which they controlled had a legitimate debt of $53,261 cancelled shortly before Commonwealth went into receivership. In addition, at the time the receivership petition was filed, there was a remaining

33. N.T. p. 2–128.

34. Exhibit P–33.

35. P.T.O. ¶ V. 2.

36. Exhibit P–33.

37. N.T. p. 1–25.

38. N.T. p. 2–29.

39. The last day of Commonwealth's fiscal year.

40. N.T. p. 2–30.

41. N.T. p. 2–30.

42. N.T. pp. 3–64 to 3–69; Exhibit P–6, Minutes of the Meeting of the Board of Directors, Commonwealth Financial Corporation, February 13, 1967. Page 2, second paragraph reads as follows: "Mr. Thal reported the management position on the dividend to be that he was reluctant to recommend payment of the prior preferred dividend because of objection raised by a representative of First Pennsylvania Bank and because of lack of availability of funds." Mr. Gerber was also present at that meeting.

43. N.T. p. 3–65, 66.

44. Exhibit P–11.

outstanding indebtedness of $25,314, which is uncollectable. This is the remaining balance from the cash advances made in the prior years by Commonwealth to Madison.

Since the transactions complained of appear not to have been at arm's length, the burden is on the defendants to prove the fairness of these transactions. However, defendants, again, have failed to offer any credible evidence of the fairness or propriety of these transactions, other than their own assertion that they never personally received any money from Madison Agency. Thus, they have failed to meet their burden of proving the fairness of such transactions. Accordingly, we hold that as a result of the transactions with Madison Agency, the defendants are liable for the sum of $78,575.

## SUPREME FILMS CORPORATION

Defendant Gerber, in his capacity as an attorney, incorporated Supreme Films, and admits that he is probably an officer and director; but does not remember the exact details.[45] Defendant Thal also admits that he may have known that Gerber was an officer and director, and perhaps a shareholder.[46] In June, 1965 and March 1967, advances were made by Commonwealth, through Quaker, to Supreme Films totaling $50,000.[47] At the time the reorganization petition was filed, the amount of this indebtedness, including accrued interest, was $51,001. At the time the reorganization was completed, this amount was still outstanding and no payments had been made.[48] The loan was secured by a lien on a film called, "Man on a Hook", with an option to convert the indebtedness into 45% of the outstanding shares of Supreme Films, at a dollar a share.[49]

Since the transaction complained of appears not to have been at arm's length, we hold that the burden is on the defendants to prove the fairness of this transaction. Defendants, in attempting to explain this transaction, state without any supporting evidence, that prior to the reorganization, some payments had been made on the loan.[50] However, they offered no testimony or evidence to show that the loans from Commonwealth to Supreme Films were made in the best interest of Commonwealth. In addition, it appears that defendants had no knowledge of the film business, nor did they make any independent investigation into the ability or stability of Supreme Films.[51] Thus, they have not met their burden. Accordingly, we hold that as a result of advances to Supreme Films, the defendants are liable in the amount of $51,001.

## MERCURY BOOKS, INC.

Defendant Gerber was a stockholder in Mercury Books.[52] The defendants admitted that they controlled the affairs of Mercury Books by stating that they used it merely as a conduit for the transaction with Commonwealth.[53] On December 29, 1964, Commonwealth advanced $24,000 to Mercury.[54] In return, Mercury gave Commonwealth a note, secured by 2,400 shares of Class A preferred stock of Commonwealth Corporation, $10 par value.[55] On August 31, 1967, this indebtedness was cancelled for the redemption of the 2,400 shares.[56] As stated before, this was at a time when defendants knew that Commonwealth was experiencing substantial financial difficulties.[57] However, defend-

---

45. N.T. p. 1–52.

46. N.T. p. 3–72.

47. N.T. p. 2–30.

48. N.T. p. 2–31.

49. N.T. p. 2–63.

50. N.T. p. 2–134.

51. N.T. p. 3–72.

52. P.T.O. ¶ V. 2.

53. N.T. p. 2–136.

54. Exhibit P–34, N.T. p. 2–32.

55. Exhibit P–38.

56. N.T. p. 2–33.

57. See discussion re: Madison Agency, Inc., *supra*.

ants claim that the transaction caused no harm to Commonwealth. They state that the indebtedness arose in 1964 in fulfillment of a pledge to redeem stock on demand from Plymouth Mutual Life Insurance Company.[58] Mercury Books was simply used as a vehicle to accomplish that transaction. As evidence of this, they point to the check from Commonwealth to Mercury, dated December 29, 1964. It is endorsed "for deposit only to the account of Plymouth Mutual Life Insurance Co.—payment for purchase of 2,400 shares of Class A preferred Commonwealth Financial Corporation stock." Defendants maintain that this is evidence that no funds of Commonwealth ever remained with Mercury. The transaction on August 31, 1967, merely completed the bookkeeping entries for this 1964 transaction.

Even if we assumed that this description of the transaction by the defendants is accurate, an investigation of the underlying transaction in 1964 also shows self-dealing.[59] The net effect of this 1964 transaction was to redeem $24,000 worth of stock from Plymouth Mutual. The record shows that immediately before this, defendant Gerber had resigned as an officer and director of Plymouth Mutual in November, 1964.[60] The transaction in question took place on December 29, 1964. Defendants testified that Commonwealth had pledged to Plymouth to redeem the stock on demand. This pledge was made while defendant Gerber was still an officer and director of Plymouth.

Thus, the transaction of December 29th was predicated upon an earlier agreement with Plymouth, which occurred during a time when defendant did occupy a position as an officer and director of Plymouth.

Because of defendant Gerber's relationship to both Mercury Books and Plymouth Mutual, and the suspicious circumstances of these transactions; they do not appear to be arm's length bargains. Thus, the burden is on the defendants to prove the fairness of these transactions to Commonwealth. Since there is no evidence of the propriety of these transactions, defendants have not met their burden. Accordingly, we hold that as a result thereof, defendants are liable for the sum of $24,000.

## ARIZONA INVESTMENT COMPANY; HARRISON REALTY CORPORATION; and TEMPLE MORTGAGE AND INVESTMENT COMPANY

On December 14, 1962, the defendants caused Commonwealth to make advances in the following amounts: $300,000 to Arizona Investment Company; $100,000 to Harrison Realty Corporation; and $100,000 to Temple Mortgage and Investment Company.[61] Defendants admit that they controlled and dominated these three companies.[62] Defendants respond that the transaction was merely a device to issue debentures to Safeguard Mutual Insurance Company. However, in unraveling the facts of this transaction, it appears to this court to be one of the most devious, circuitous and complicated methods of issuing debentures that could be devised. The net effect of which was to bleed $500,000 of the assets of Commonwealth out of the corporate treasury and into corporations controlled and dominated by the defendants. The $500,000 in question was transferred from Temple, Arizona and Harrison in varying amounts to Plymouth Mutual Life Insurance Company, the West Indies Bank, United Services Association, United National Insurance Company, and the F.D.R. Foundation.[63] Defend-

---

58. N.T. pp. 2–134, 135.

59. Even absent self-dealing, the cancellation of a debt for redemption of stock under conditions existent on August 31, 1967, was a breach of fiduciary duty. See discussion, re: Clark Insurance Co., *infra.*

60. P.T.O. ¶ V. 3.

61. P.T.O. ¶ V. 10.

62. P.T.O. ¶ V. 5.

63. N.T. pp. 1–95 to 97, 2–96.

ants controlled and dominated all of these corporations and/or held fiduciary positions with them.[64] These five organizations then returned the cash to Commonwealth in exchange for $500,000 worth of debentures.[65] Three hundred and fifty thousand dollars worth of these debentures were later sold by these various corporations for cash to the Safeguard Mutual Insurance Company.[66] The other $150,000 worth of debentures, or at least a major portion of them, were eventually redeemed by Commonwealth for cash.[67] Thus, the cash ended up in the hands of corporations controlled and dominated by the defendants. In a collateral transaction, defendants caused Commonwealth to purchase accounts receivable from National Investment Securities Corporation for $350,000.[68] Defendants admit that they did not check the validity of this paper.[69] As part of the deal, they received a guarantee of the accounts from Safeguard Mutual. Commonwealth then held the debentures as security for this guarantee, and as the accounts receivable became due and were not paid, they merely redeemed the debentures and cancelled the debt.[70] The testimony in the case shows that the viability and validity of the accounts were highly suspicious.[71] Thus, the net effect of the transaction was to allow Safeguard to rid itself of questionable accounts and to transfer $500,000 from Commonwealth to organizations controlled and dominated by the defendants.

Suffice it to say, that in such a transaction, the burden is on the defendants to attempt (if they possibly could) to explain or to show the fairness of this transaction to Commonwealth. Defendants' only response is to look at one side of the transaction and state that the $500,000 cash lent to Arizona, Harrison and Temple was returned four days later to the treasury of Commonwealth. They ignored the fact that the corresponding transactions left $500,000 in unpaid notes owing to Commonwealth, and $500,000 in outstanding debentures, the large portion of which was eventually redeemed for cash via the Safeguard Mutual guarantee of accounts receivable and outright redemption. On the other hand, plaintiffs would have us hold defendants liable not only for the $500,000, but also for the $350,000 which Commonwealth put out to National Investment Securities for the purchase of worthless accounts receivable. We cannot go this far, for the transactions involved must be looked at with a view towards the overall effect to Commonwealth. The transactions were all part of one overall "deal" which had the net effect of increasing Commonwealth's liabilities by $500,000 in exchange for worthless notes. Accordingly, we find that as a result of these transactions, the defendants are liable in the amount of $500,000.

## UNITED NATIONAL INSURANCE COMPANY

On or about February 11, 1963, and August 29, 1963, the defendants caused Commonwealth to transfer the sums of $50,000 and $100,000, respectively, to the United National Insurance Company.[72] The defendant Gerber was an officer, director and stockholder of the United National Insurance Company.[73]

Since this transaction does not appear to have been an arm's length bargain, the burden is on the defendants to prove its fairness to Commonwealth. The

---

64. P.T.O. ¶¶ V. 3, .5, .6, .7,; N.T. p. 1–75.

65. Exhibit D–2; N.T. p. 3–32.

66. N.T. p. 1–103.

67. N.T. p. 3–35.

68. P.T.O. ¶ V. 11; Exhibit P–16, P–17; N.T. p. 2–103.

69. N.T. p. 3–51.

70. N.T. pp. 3–52, 53.

71. A large number of the accounts were owned by Leopold Weiner, members of his family and friends of his. Leopold Weiner was the president of Safeguard (N.T. pp. 3–51, 52).

72. Exhibits P–21, 22.

73. P.T.O. ¶ V. 6.

$100,000 paid on August 29, 1963, was purportedly in exchange for accounts worth in excess of $103,000.[74] However, by defendant Gerber's own admission, this was a fictitious transaction.[75] The money was deposited to the "United National Special Account" which defendants in the other transaction maintain had no connection with United National. Again, defendants claim that Commonwealth suffered no loss as a result of this, and defendants maintain that the money in fact was repaid.[76]. However, they again offer no evidence [77] in support of this assertion other than their own incredulous statements that it in fact was repaid. As to the $50,000, defendants maintain that it was deposited to United National Insurance Company special account, and that the special account had nothing to do with United National Insurance Company, but was in fact an account maintained for the benefit and use of Commonwealth Financial Corporation and had nothing to do with United National Insurance Company.[78] This $50,000, according to defendants, was supposedly for the redemption of Commonwealth capital notes from another party, and had nothing to do with United.[79] But again, they put forth no credibile evidence that this was the case. Accordingly, we find that the defendants have not met their burden and that as a result of these transactions with United National Insurance Company, they are liable in the sum of $150,000.

## TRANSACTIONS ALLEGING BREACH OF DUTY

### CLARK INSURANCE COMPANY

On September 27, 1965, Commonwealth advanced to C. M. Clark Insurance Company $25,000, and again on December 21, 1966, Commonwealth advanced a second $25,000 to C. M. Clark.[80] As of August 31, 1967, there was outstanding from C. M. Clark an indebtedness of $22,500, plus $450 accrued interest. On that date, this indebtedness was cancelled in exchange for the redemption of 2,295 shares of Class A preferred stock —$10.00 par value.[81]

The transaction complained of appears to be an arm's length one. Thus, the burden is on the plaintiffs to show that defendants breached their duty of care in managing the corporate affairs. In the Clark Insurance transactions, we have the situatin where the defendants caused a valid obligation owed to Commonwealth by C. M. Clark to be cancelled, in exchange for a redemption of stock for which there was no obligation to redeem. This, at a time when defendants knew of the financial difficulties of Commonwealth.[82] Under either the common law or Pennsylvania law, as expressed in Selheimer v. Manganese Corporation of America, *supra* it is clear that defendants have breached their duty. To engage in such a transaction under circumstances existence on August 31, 1967, is certainly not in the best interest of Commonwealth. It appears that the defendants, prior to abandoning the sinking ship, were attempting to divert every penny of assets remaining in Commonwealth that they could possibly get away with. Accordingly, we hold that as a result of the transactions with C. M. Clark Insurance Company, the defendants are liable in the amount of $22,950.

### FOAM CORE CORPORATION

Prior to August 31, 1967, Commonwealth had advanced various sums of

---

74. Exhibit P–23.

75. N.T. p. 1–123.

76. N.T. p. 2–142.

77. *e. g.*, Ledger sheets, cancelled checks, etc.

78. N.T. p. 3–8.

79. N.T. p. 3–8.

80. N.T. p. 2–37.

81. N.T. p. 2–38.

82. See discussion, re: Madison Agency, Inc., *supra*.

money to Foam Core.[83] On August 31, 1967, the outstanding indebtedness was $5,100, plus $250 accrued interest, in exchange for the redemption of capital stock.[84] This transaction is similar to the one involving C. M. Clark Insurance Co. There has been no showing that the defendants had any interest in Foam Core.

Thus, the burden is on the plaintiffs to prove the defendants' breach of duty. As with the Clark Insurance transaction, we find that the defendants have breached their duty. For no apparent reason other than to divert assets prior to bankruptcy, the defendants cancelled an outstanding indebtedness in exchange for the redemption of stock for which they had no obligation to redeem. Accordingly, as a result of the transaction with Foam Core Corporation, we find that the defendants are liable in the amount of $5,350.

### GENERAL WASTE AND MIS-MANAGEMENT

As previously discussed, absent a showing that a particular transaction entered into by the corporation was not done so at arm's length (*i. e.*, where there was a conflicting interest by a corporate fiduciary), the burden does not shift to the defendant to prove the fairness of a particular transaction and the sound business judgment rule applies. Plaintiffs claim that during the reorganization proceedings, it was discovered that there had been a shrinkage in the assets of the corporation of approximately $5,000,000, and that such shrinkage was caused by the mismanagement and waste of the defendants. In support of this argument, the plaintiffs point to the transactions which we have just discussed. We find that the defendants' actions in all of these foregoing transactions were willful and malicious and caused substantial injury to Commonwealth and its subsidiary corporations. This finding does not lead us

to the conclusion that plaintiffs have met their burden in showing that the entire loss sustained by Commonwealth Corporation was the result of activities on the part of the defendants. At best, we can only speculate as to what caused this loss to Commonwealth. Since the plaintiffs have not met their burden of proving proximate cause, the defendants cannot be held liable for the entire amount of Commonwealth's loss. The foregoing shall constitute our findings and conclusions as required by Rule 52 of the Federal Rules of Civil Procedure.

---

83. Exhibit P–35.

84. N.T. p. 2–36.